IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 20, 2021 Session

## REBECCA M. POMEROY v. MICHAEL L. McGINNIS

**Appeal from the Circuit Court for Hamilton County**
**No. 19C551          Kyle E. Hedrick, Judge**

_____

### No. E2020-00960-COA-R3-CV

_____

In this action for conversion, the plaintiff alleged that the defendant, who is her brother, unilaterally surrendered an annuity fund that had been titled jointly in their names, received a check for the proceeds, endorsed her signature without her permission, and deposited the proceeds in a bank account to which the plaintiff had no access. Upon the defendant's motion for summary judgment, in which he asserted that the plaintiff had been an owner of the annuity in name only and that the three-year statute of limitations had expired well before she filed the complaint, the trial court found that the plaintiff was a titled co-owner of the annuity and that genuine issues of material fact existed as to whether the statute of limitations had been tolled by the defendant's fraudulent concealment of the cause of action from the plaintiff. Following a bench trial, the trial court found that the defendant had fraudulently concealed the cause of action from the plaintiff and that he had committed conversion of the plaintiff's one-half interest in the check representing the annuity proceeds. The trial court awarded to the plaintiff a judgment in the amount of one-half of the annuity proceeds plus pre-judgment interest calculated from the date of the check's endorsement. The defendant has appealed. Having discerned a minor mathematical error in the judgment, we modify the amount to reduce it by $90.00, affirming the trial court's award to the plaintiff in the amount of $59,674.22 rather than $59,764.22. We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Phillip C. Lawrence, Chattanooga, Tennessee, for the appellant, Michael L. McGinnis.

John R. Morgan, Chattanooga, Tennessee, for the appellee, Rebecca M. Pomeroy.

# OPINION

## I. Factual and Procedural Background

The plaintiff, Rebecca M. Pomeroy, initiated this action by filing a complaint on May 7, 2019, in the Hamilton County Circuit Court ("trial court") against the defendant, Michael L. McGinnis, who is her brother. Ms. Pomeroy alleged that on April 26, 2012, Mr. McGinnis had committed "fraudulent conversion" of one-half of the proceeds from an annuity by forging Ms. Pomeroy's signature on a check in the amount of $77,131.87 ("the Check") that had been made payable to both Mr. McGinnis and Ms. Pomeroy by Sun Life Financial ("Sun Life"). Although in her complaint, Ms. Pomeroy termed the Sun Life fund a life insurance policy, it is undisputed that it was an annuity fund originally purchased with monies belonging to the parties' mother, Freeda Wallace McGinnis. It is also undisputed that Mr. McGinnis and Ms. Pomeroy were designated on the annuity documents as the owners and beneficiaries. The issuance of the Check was prompted by Mr. McGinnis's submission of a surrender form in 2012. Freeda Wallace McGinnis ("Decedent") subsequently died in 2016.

In her complaint, Ms. Pomeroy averred that she had no knowledge of the Check until it came to light in 2019 via discovery related to Mr. McGinnis's divorce proceedings from his then-wife, Sondra McGinnis. Alleging that Mr. McGinnis's actions in forging her endorsement on the Check constituted "willful fraud and willful conversion," Ms. Pomeroy requested compensatory damages in the amount of $38,568.93, representing one-half of the Check amount,[1] plus prejudgment interest dated from April 26, 2012, and punitive damages for fraud in the amount of $50,000.00. Ms. Pomeroy also alleged that "[i]n the alternative," Mr. McGinnis had been "unjustly enriched by his actions in the same amount."

Mr. McGinnis filed an answer on June 17, 2019, denying any wrongdoing. He admitted that he had signed Ms. Pomeroy's name to the Check, but he claimed that "it was done with [Ms. Pomeroy's] knowledge, consent and approval." Mr. McGinnis also denied that Ms. Pomeroy and he were the "true owners" of the annuity funds. He stated the following regarding the origin and purpose of the annuity:

---

[1] We note a nominal mathematical error in Ms. Pomeroy's request in that half of the proceeds from the Check would equal $38,565.93, rather than $38,568.93 (rounded down to the nearest cent). Because Mr. McGinnis did not raise this nominal error as an issue before the trial court and has not raised it as an issue on appeal, we decline to address it further in this opinion.

The Sun Life Financial check represents the proceeds of an annuity that was purchased for the benefit of [Decedent]. The sale of the house owned by [Decedent] on June 15, 1999 generated a gross sales price of $107,950. In 2006, the remaining net proceeds of the sale of that house were used to purchase an annuity for [Decedent] that was placed in the names of [Ms. Pomeroy] and [Mr. McGinnis] as constructive trustees for the benefit of [Decedent]. The annuity was cashed out in 2012, and the proceeds of the check were used over time for the maintenance of [Mr. McGinnis's] household of which both [Decedent] and [Ms. Pomeroy] were members.

In his answer, Mr. McGinnis raised affirmative defenses of expiration of the statute of limitations; lack of standing and lack of damages purportedly due to Ms. Pomeroy's lack of ownership interest; inapplicability of the doctrine of unjust enrichment; and failure to state a claim upon relief could be granted, pursuant to Tennessee Rule of Civil Procedure 12.02(6), as to Ms. Pomeroy's fraud claim. Ms. Pomeroy subsequently filed exhibits she indicated had been omitted in error from her complaint, specifically a copy of the Check, bearing endorsements purportedly by "Rebecca Pomeroy" and "Mike McGinnis," as well as a copy of a bank deposit slip, reflecting that $77,131.87 had been deposited into Mr. McGinnis's and Sondra McGinnis's joint account on April 26, 2012.[2]

On July 19, 2019, Mr. McGinnis filed a motion for summary judgment, again asserting that Ms. Pomeroy lacked standing because she lacked ownership status, that the fraud and conversion claims should be dismissed pursuant to the three-year statute of limitations provided in Tennessee Code Annotated § 28-3-105, and that the unjust enrichment claim was inapplicable to this action because the parties had not entered into a contract. In addition to his own affidavit, Mr. McGinnis attached to his motion an affidavit executed by Michael Fortner, a certified financial planner, who stated in part that "[i]n or around 2006 or 2007," he had been invited into the McGinnis home and had met with Mr. McGinnis and Ms. Pomeroy regarding the purchase of the annuity fund.

Ms. Pomeroy filed a response objecting to the motion and attaching an affidavit in which she denied ever having met with Mr. Fortner or having any knowledge of the annuity fund until she discovered it through Mr. McGinnis's divorce proceedings. Ms. Pomeroy acknowledged in her affidavit that she had been a member of her brother's household since she retired in 2007. However, she averred that she had regularly paid rent, a portion of Decedent's living expenses, and "the majority of the groceries for the household." Ms. Pomeroy attached to her response, *inter alia*, a copy of Decedent's "Last Will and Testament," dated December 7, 1979, in which Decedent had bequeathed

---

[2] Inasmuch as several individuals involved in this case share a surname, we will at times in this opinion continue to refer to individuals by their first and last names for clarity's sake. No disrespect is intended.

her estate, in the event of her husband's predeceasing her, equally to Mr. McGinnis and Ms. Pomeroy. Decedent's husband had died in 1999. Ms. Pomeroy also noted in her affidavit that Decedent's estate had never been probated.

Ms. Pomeroy subsequently filed a motion to amend her complaint, pursuant to Tennessee Rule of Civil Procedure 15, to aver that Mr. McGinnis "fraudulently concealed his fraudulent endorsement of her signature on the Sun Life check in 2012, and that he fraudulently concealed his deposit of said check into his personal account." Upon noting no objection from Mr. McGinnis, the trial court entered an order on September 18, 2019, granting Ms. Pomeroy's motion to amend the complaint.

Following a hearing, the trial court entered an order on September 19, 2019, denying Mr. McGinnis's motion for summary judgment upon finding that Ms. Pomeroy had standing as a titled owner of the annuity funds and that a genuine issue of material fact existed as to whether Mr. McGinnis had fraudulently concealed his actions such that Ms. Pomeroy was prevented from discovering the cause of action for more than three years prior to the filing of the complaint. Concerning the statute of limitations, the trial court elucidated in relevant part:

> [Ms. Pomeroy] files her complaint upon the theory of wrongful conversion, fraud and unjust enrichment. The applicable statute of limitations, under any applicable code section, has expired. To survive summary judgment, Ms. Pomeroy must raise a question of fact as to the tolling of the applicable statutes of limitations.
>
> Our Supreme Court addressed this issue in Pero's Steak and Spaghetti House v. Lee, 90 S.W.3d 614 (Tenn. 200[2]). Specifically, the Court held that, when dealing with the tort of conversion of a negotiable instrument, the discovery rule has no application. Instead, the statute of limitations may only be tolled upon a showing of fraudulent concealment:
>
>> To establish fraudulent concealment, a plaintiff must prove the following[:] (1) that the defendant took affirmative action to conceal the cause of action or remained silent and failed to disclose material facts despite a duty to do so; (2) that the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence; (3) that the defendant had knowledge of facts giving rise to the cause of action; and (4) that the defendant concealed material facts from the plaintiff by withholding information or making use

- 4 -

of some [device] to mislead the plaintiff, or by failing to disclose information when he or she had a duty to do so.

(Pero's Steak and Spaghetti House at p. 625) (citing Shadrick v. Coke[r], 963 S.W.2d 726, 735[-36] (Tenn. 1998)). Thus, [Ms. Pomeroy] must raise an issue of fact with respect to her claim that the statute of limitations should be tolled due to [Mr. McGinnis's] fraudulent concealment.

Certainly factors (1), (3) and (4) are easily met by the facts that [Mr. McGinnis] received a check made payable to he and [Ms. Pomeroy] as title owners of an annuity; that [Mr. McGinnis] never informed [Ms. Pomeroy] of either the surrender of the annuity (which would result in the payment of the proceeds of the annuity to [Ms. Pomeroy] and [Mr. McGinnis]) or of a check issued to [Ms. Pomeroy] containing funds from an annuity under which she was a [titled] owner[]; that [Mr. McGinnis] endorsed [Ms. Pomeroy's] name to the check with no authority from or knowledge by [Ms. Pomeroy]; that [Mr. McGinnis] deposited those funds into his own personal account; and that [Mr. McGinnis] then disbursed all of those funds from his account without informing [Ms. Pomeroy] of the same. The only remaining question is whether [Ms. Pomeroy] has satisfied requirement (2), i.e., [whether Ms. Pomeroy] could have discovered the cause of action through reasonable care and diligence. The determination of what constitutes reasonable care and diligence is classic jury fare. Moreover, there are multiple questions of fact as to what [Ms. Pomeroy] did and did not do with respect to the financial affairs of her mother – much less what actions would constitute reasonable care and diligence by a person similarly situated to [Ms. Pomeroy].

The trial court subsequently conducted a bench trial on June 4, 2020. In addition to her own testimony, Ms. Pomeroy presented testimony from Sondra McGinnis and Josh McGinnis, the adult son of Mr. McGinnis and Sondra McGinnis. In addition to his own testimony and the deposition testimony of Mr. Fortner as an exhibit, Mr. McGinnis presented testimony from Rebekah Harjes, the adult daughter of Mr. McGinnis and Sondra McGinnis, and Rebekah Harjes's husband, B.J. Harjes.

Concerning the origin of the funds utilized to purchase the annuity, Josh McGinnis, Rebekah Harjes, and B.J. Harjes each respectively testified that in December 2006, Mr. McGinnis informed them that they would each be receiving from Decedent a check in the amount of approximately $10,000.00, which they were to deposit in their own respective checking accounts. According to the plan described in this testimony, each person who received a check from Decedent would then write a check to Mr.

McGinnis in the exact same amount, which Mr. McGinnis testified was chosen in order to stay under the "gift tax" threshold for federal income tax purposes. Mr. McGinnis explained further that the plan, to which Decedent purportedly agreed, was for him to place the funds from the checks in a financial instrument and that "[l]ater it was determined that a good idea was an annuity." He testified that it was "strictly [his] decision" to include Ms. Pomeroy as an owner of the annuity, articulating: "I thought, okay, if something happens to me, somebody has got to take care of [Decedent]. So I added [Ms. Pomeroy's] name to it, and she agreed to it."

At trial, Ms. Pomeroy denied any knowledge of the annuity prior to being notified of the Check's existence by Sondra McGinnis during the divorce proceedings between Mr. McGinnis and Sondra McGinnis. Ms. Pomeroy also denied any knowledge of the plan described by Mr. McGinnis and denied having received one of the checks written by Decedent as the basis of the annuity funds. Mr. McGinnis acknowledged that he did not recall if Decedent wrote a check to Ms. Pomeroy.

Josh McGinnis related that he had never discussed the check-exchange plan with Ms. Pomeroy. Rebekah Harjes and B.J. Harjes respectively testified that they had each received a check from Decedent and had written a check in the same amount to Mr. McGinnis on the same day while sitting at Mr. McGinnis's kitchen table. Although Rebekah and B.J. Harjes acknowledged that Ms. Pomeroy was not present when they exchanged the checks, they each stated that she had been present during a large holiday dinner when the check-exchange plan was discussed. Neither Josh McGinnis, Rebekah Harjes, nor B.J. Harjes testified to having any knowledge of the annuity.

Sondra McGinnis denied that prior to her divorce proceedings, she had any knowledge of the check-exchange plan or the annuity, stating that she and Mr. McGinnis had kept separate finances during the last twenty years of their marriage. According to Sondra McGinnis, she did not learn of the annuity, the Check, or the deposit of the annuity funds in her joint account with Mr. McGinnis until she reviewed Mr. McGinnis's financial records as a result of discovery obtained during the divorce proceedings. She testified that "within a few days [Mr. McGinnis] transferred it [the annuity proceeds] to an account just in his name that I didn't know about." Sondra McGinnis corroborated Ms. Pomeroy's testimony that Ms. Pomeroy had not learned of the Check's existence until Sondra McGinnis notified her after observing that the co-endorsement on the Check did not appear to be Ms. Pomeroy's signature.

On June 16, 2020, the trial court entered an order awarding a judgment to Ms. Pomeroy in the amount of $59,764.22, consisting of $38,568.93, which represented half of the Check proceeds, plus $21,105.29 in prejudgment interest calculated from April 26,

2012, the date that Mr. McGinnis had cashed the Check.[3] The court incorporated an attached memorandum opinion in which it found that Mr. McGinnis had converted Ms. Pomeroy's half of the annuity proceeds and had fraudulently concealed his actions such that Ms. Pomeroy's complaint was not time-barred by the statute of limitations. The court expressly found Ms. Pomeroy's testimony to be credible and Mr. McGinnis's testimony not to be credible in certain aspects. As to Mr. Fortner's deposition testimony, the court stated that it did not have "a tremendous amount of confidence that [Mr. Fortner] had great recollection of much of anything" related to the 2006 purchase of the annuity. The trial court did not make a determination regarding Ms. Pomeroy's alternative claim of unjust enrichment. Mr. McGinnis timely appealed.

## II. Issues Presented

Mr. McGinnis presents four issues on appeal, which we have reordered and restated slightly as follows:

1.  Whether the trial court erred by finding that Ms. Pomeroy had a property ownership interest in the proceeds of the Check.

2.  Whether the trial court erred by finding that Ms. Pomeroy's claims were not barred by the applicable statute of limitations.

3.  Whether the trial court erred by finding that Mr. McGinnis's actions amounted to fraudulent concealment.

4.  Whether the claim of unjust enrichment is applicable to the facts of this case.

## III. Standard of Review

We review a non-jury case *de novo* upon the record with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). We review questions of law *de novo* with no presumption of correctness. *See Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)); *see also In re Estate of Haskins*,

---

[3] We note an apparent mathematical error in the judgment in that the total sum of $38,568.93 and $21,105.29 equals $59,674.22 rather than $59,764.22. We will address this mathematical error in a subsequent section of this Opinion.

224 S.W.3d 675, 678 (Tenn. Ct. App. 2006). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. Claim of Conversion

Three of the issues raised by Mr. McGinnis involve his contention that the trial court erred in granting a judgment in favor of Ms. Pomeroy on her conversion claim. Specifically, he argues that (1) Ms. Pomeroy did not possess an ownership interest in the proceeds of the Check, (2) Ms. Pomeroy's claim was time-barred by the applicable statute of limitations, and (3) Ms. Pomeroy failed to prove that Mr. McGinnis had fraudulently concealed the facts concerning the annuity surrender from her. Ms. Pomeroy contends that the trial court correctly found that she had an ownership interest in the proceeds of the Check and also properly determined that she could not have reasonably discovered Mr. McGinnis's actions in converting her portion of the Check proceeds sooner because Mr. McGinnis fraudulently concealed those actions from her. Upon thorough review of the record and applicable authorities, we determine that the trial court did not err in granting to Ms. Pomeroy a judgment concerning her conversion claim.

Regarding the elements of conversion, this Court has explained in relevant part:

> Conversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights. *Barger v. Webb,* 216 Tenn. 275, 391 S.W.2d 664, 665 (1965); *Lance Prods., Inc. v. Commerce Union Bank,* 764 S.W.2d 207, 211 (Tenn. Ct. App. 1988). Conversion is an intentional tort, and a party seeking to make out a *prima facie* case of conversion must prove: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights. *Kinnard v. Shoney's, Inc.,* 100 F. Supp. 2d 781, 797 (M.D. Tenn. 2000); *Mammoth Cave Prod. Credit Ass'n v. Oldham,* 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977).

*PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012).

On appeal, Mr. McGinnis ostensibly implies, although he does not fully address, "the question of whether the check can be considered to be 'tangible personal property.'" However, this Court in *PNC Multifamily* clarified that "conversion of checks is actionable," further explaining:

Although there is authority to the contrary, the general rule is that money is an intangible and therefore not subject to a claim for conversion. However, there is an exception where the money is specific and capable of identification or where there is a determinate sum that the defendant was entrusted to apply to a certain purpose. Identifiable funds are deemed a chattel for purposes of conversion, and conversion may be established where a party shows ownership or the right to possess specific, identifiable money. Trover will lie whenever the plaintiff's money has come into the defendant's possession and has been converted without the plaintiff's express or implied assent that the relation of debtor and creditor should arise.[4] For money to be a subject of conversion, it need not be specifically earmarked. Moreover, specific coins or bills need not be identified, nor is it necessary to identify the specific dollars and coins represented by the face value of checks and other negotiable instruments. Conversion of checks is actionable because checks designate specific amounts of money for use for specific purposes.

*Id.* (quoting 90 C.J.S. *Trover and Conversion* § 16 (2012)) (footnotes from C.J.S. omitted in *PNC Multifamily*) (emphasis added). *See also* Tenn. Code Ann. § 47-3-420(a) (2001) ("The law applicable to conversion of personal property applies to instruments.").

In granting a judgment in favor of Ms. Pomeroy on her conversion claim, the trial court specifically found in pertinent part:

The proof today clearly demonstrates, and was readily admitted by [Mr. McGinnis], and the Court so finds, that Ms. Pomeroy played no role at all in the finances of her mother, and that she trusted her brother, and that the two of them had an excellent relationship at least through this financial transaction that we're here about today with Sun Life, and he was handling that financial matter for his mother by his own admission. It was he and his mother together.

There is a dispute about whether Ms. Pomeroy signed any documents. There was an application document, although the Court does not have the application as a part of the exhibits. There was a surrender form, although the Court does not have the surrender form as a part of its

---

[4] "Trover" has been defined in pertinent part as "[a] common-law action for the recovery of damages for the conversion of personal property . . . ." BLACK'S LAW DICTIONARY 1545 (8th ed. 2004) (emphasis added); *see also PNC Multifamily*, 387 S.W.3d at 553.

documents. And there was a check. And, admittedly, she did not endorse the check.

[Ms. Pomeroy's] testimony was that she never knew anything about this transaction and was never in a meeting and never signed an application and never signed a surrender form. Mr. McGinnis states that [Ms. Pomeroy] was in a meeting, that she did sign the application, that she also signed the surrender form, and that she did not sign the check, but that he signed her name with no permission.

The deposition of Mr. Fortner states that he has no idea about the surrender form because he doesn't even think the surrender form came through his office, but that it ultimately was faxed to a number that he gave them to fax it to. He just, frankly, doesn't remember. He does have a recollection, however, of being in a meeting where [Ms. Pomeroy] signed an application form.

The Court finds that Ms. Pomeroy's testimony was credible testimony concerning not being present for anything or knowing about anything. While I appreciate Mr. Fortner's testimony, he is attempting to recall back to 2006. And, frankly, reading his deposition did not leave me with a tremendous amount of confidence that he had great recollection of much of anything and was doing his best to review whatever documents he had to give his testimony.

The Court did not find credible the testimony of Mr. McGinnis on these questions. And, therefore, the Court does find that [Ms. Pomeroy] could not have discovered the cause of action despite exercising reasonable care and diligence because she did not even know the transaction had occurred. The Court, therefore, finds that fraudulent concealment does apply and that the claim is not time-barred.

Next, the Court turns to the dispute itself, having found that it is within the statute of limitations due to concealment. The Court finds that there is no dispute at all concerning the following: All of the financial maneuvering, both the check writing and the annuity, were done with an eye towards saving money from the government, be it inheritance tax or be it the story that Mr. McGinnis told about his grandmother who the government got all of her money before they put her on Medicaid and there was nothing left and his mother had to deal with that situation.

- 10 -

And so the purpose behind this transaction, and particularly the annuity transaction, was to make sure that they could shield this money and have money. And, in fact, there was testimony that when [Decedent] was in the nursing home for a fairly lengthy period of time that she was on Medicaid during a portion of that. In other words, in most nursing homes, you get 100 days on Medicare and then it flips to Medicaid, unless you have a qualifying event and then go back on Medicare again. And she was on Medicaid, so it worked.

That's not to say there is anything nefarious about what happened. It just says that the planning that they did was successful planning. But what that also means to this Court is in order to represent to the federal government that [Decedent] was eligible for Medicaid, the money could not be hers. The ownership had to be with someone else to make that representation and to obtain Medicaid.

The Court also looks at the deposition testimony of Mr. Fortner. The Court is going to read into the record, from page 14, his response to the question by [Mr. McGinnis's counsel] asking can you describe how these parties were differentiated when he is talking about an annuity. Here is the response beginning at line 5. Answer: Okay. The owner is self-explanatory. The owner is, you know, basically the – the owners control the contract. If you have a joint owner – if you have joint owners, changes of beneficiary, changes of annuitants, cancellation, changes of riders of benefits must have the signature of all owners and have the permission of all owners.

The beneficiaries in this case were [Mr. McGinnis] and [Ms. Pomeroy] as well. Okay. The beneficiary is basically they get the residuals after the annuitant passes.

The annuitant is named by the owner and is the beneficiary of any income that comes off the annuity. So, in essence, it was – it was a way to make sure that the money was there to benefit their mother but not have them to go around any, say, like a – if she became unable to make her own decisions, they're listed as the owner and they would be able to control it.

What's important to the Court about this testimony, and what's important to the Court about this transaction, is that any surrender of this policy, meaning the monies that were in it, if those monies were surrendered, it goes to the owner. It doesn't go to the annuitant. It doesn't

- 11 -

go to the beneficiary. The money in that annuity goes directly to the owners because they control and own the proceeds of the annuity. And the reason to have them own the proceeds of the annuity is to divest the mother of the ownership such that she would be able to be in a nursing home and be taken care of without the government getting those funds. The owners owned the corpus, and the Court so finds.

The next thing that happens – the other thing the Court looks at with regard to how this money is to be divided, alternatively after looking at ownership, is also to look at the intention of the mother. And this is an alternative, but the mother has a last will and testament that says [Ms. Pomeroy] and [Mr. McGinnis] shall share and share alike.

Now, admittedly, that's 1979. This will may well have been torn up after this time. I have no evidence one way or another, and this isn't the enforcement of a will. It's just a small amount of evidence of what the mother said in 1979.

But then when the annuity was taken out and owners were listed, both Mr. McGinnis and Ms. Pomeroy were listed as owners of this. And everything that went through this had to go through both of them. Any changes that would be made had to go through both of them as owners.

Surrender forms were ordered. And according to the testimony of Mr. Fortner, the only person who was contacted – who contacted him about the surrender forms was Mr. McGinnis. The only evidence I have in this case about the decision to make a surrender is evidence that it was Mr. McGinnis and his mother. The only evidence I have of someone requesting a surrender form is that Mr. McGinnis requested this surrender form. I don't have the surrender form in front of me, but as stated earlier, I believe that Mr. McGinnis was the only person who signed the form and signed it for both he and Ms. Pomeroy. And admittedly by Mr. McGinnis, the check was signed by Mr. McGinnis both for he and Ms. Pomeroy.

As a result, the Court finds that the cause of action stated for conversion, which is: Number 1, the appropriation of another's property to one's own use and benefits; number 2, by the intentional exercise of dominion over it; and number 3, defiance of the true owner's rights. Clearly, all three of those were satisfied by Mr. McGinnis surrendering and negotiating that check.

We will address each of Mr. McGinnis's issues related to conversion in turn.

### A. Ms. Pomeroy's Ownership Interest in the Check

Although Mr. McGinnis acknowledges that Ms. Pomeroy and he were the titled owners of the annuity, he contends that they were owners in name only and that the effect of the transaction establishing the annuity was to create something of a constructive trust for Decedent with Mr. McGinnis's "legal posture" "in the nature of a trustee or custodian." In its final judgment, the trial court determined that no dispute existed concerning the original purpose of the annuity transaction on the part of Decedent and Mr. McGinnis, finding that the purpose was to "shield this money" in the event that Decedent needed long-term medical care so that she could benefit from Medicaid coverage. The trial court further found that "in order to represent to the federal government that [Decedent] was eligible for Medicaid, the money could not be hers" because "[t]he ownership had to be with someone else to make that representation and to obtain Medicaid." The trial court's findings indicate that the evidence relied upon by Mr. McGinnis to argue that a constructive trust had been created by the annuity actually established that through creation of the annuity, Decedent had been divested of ownership over the annuity funds and that equal ownership interest was then held by the annuity owners, Mr. McGinnis and Ms. Pomeroy.

At the outset, we note Mr. McGinnis's assertion on appeal that the trial court merely "found by implication and not by a direct, express finding that Ms. Pomeroy obtained an ownership interest in the check representing the proceeds of the annuity." However, our review of the trial court's orders reveals that the trial court definitively found that Ms. Pomeroy possessed a one-half ownership interest in the Check. In its September 2019 order denying Mr. McGinnis's motion for summary judgment, the trial court addressed Mr. McGinnis's argument that Ms. Pomeroy lacked "standing to sue for the return of the funds" based on his assertion that she "never owned the funds." The trial court found that "the title owners of those [annuity] funds" were Mr. McGinnis and Ms. Pomeroy, as demonstrated by Mr. Fortner's affidavit and "the payees on the check." The trial court thereby denied Mr. McGinnis's motion for summary judgment predicated in part on the court's express finding that Ms. Pomeroy possessed an ownership interest in the Check. Moreover, following trial, the trial court found in its final order that the titled owners, Mr. McGinnis and Ms. Pomeroy, were the owners of the annuity funds.

Apart from the Check, no documents concerning the annuity itself are in the record on appeal, and such were not presented to the trial court. However, Mr. McGinnis presented Mr. Fortner's deposition testimony, and although the trial court questioned Mr. Fortner's memory of details concerning the initial meeting at Mr. McGinnis's home to discuss the annuity, the court did credit Mr. Fortner's testimony concerning the

definitions of terms related to the annuity. Mr. Fortner explained in his deposition testimony that at the time of the subject annuity purchase, he sent the completed application to LPL Financial, "the brokerage firm that [he] was clearing through at the time," and LPL Financial in turn sent it to Sun Life. Mr. Fortner testified that he had searched for records related to the annuity and had been unable to locate any. He also related that he remembered meeting Ms. Pomeroy at the time that he initially presented information concerning the annuity at Mr. McGinnis's home, and he stated that he witnessed the signing of the application form by Mr. McGinnis and Ms. Pomeroy. However, Mr. Fortner subsequently acknowledged that he did not remember whether Ms. Pomeroy participated in the presentation or meeting.

Regarding the nature of the annuity, Mr. Fortner explained that an annuity is "a stream of income payments" and that "a variable annuity is backed by a life insurance company." He further explained that "if you put money into an annuity and you take money out in payments and you die, if you have not taken the amount of money out that you put [in], then that is returned to your beneficiary." Mr. Fortner confirmed that Mr. McGinnis and Ms. Pomeroy were designated as the joint owners and the beneficiaries of the annuity while Decedent was designated as the annuitant. When questioned regarding the meaning of these designations, Mr. Fortner testified in relevant part:

> The owner is self-explanatory. The owner is, you know, basically the – the owners control the contract. . . . [I]f you have joint owners, changes of beneficiary, changes of annuitants, cancellation, changes of riders of benefits must have the signature of all owners and have the permission of all owners.
>
> The beneficiaries in this case were [Mr. McGinnis] and [Ms. Pomeroy] as well. . . . The beneficiary is basically, they get the residuals after the annuitant passes.
>
> The annuitant is named by the owner and is the beneficiary of any income that comes off of the annuity. So, in essence, it was – it was a way to make sure that the money was there to benefit their mother but not have them to go around any, say, like a – if she became unable to make her own decisions, they're listed as the owner and they would be able to control it.

Mr. Fortner acknowledged that the subject annuity had never earned income above its original value and that no stream-of-income payments had ever been initiated for the benefit of Decedent as the annuitant. He noted that during a typical presentation to clients concerning an annuity, he "would have talked about the surrender charges, and

[he] would have talked about that the owners are in full control. The annuitant is just the – you know, the recipient of the proceeds of income streams and things like[] that."

Inasmuch as the owners were in control of any changes to the annuity and were the individuals to whom the annuity funds were to be paid in the event of a surrender, as occurred here, we determine that the evidence preponderates in favor of the trial court's finding that Mr. McGinnis and Ms. Pomeroy held joint ownership interest in the annuity funds. Additionally, Mr. McGinnis and Ms. Pomeroy were also named beneficiaries of the annuity account, meaning that in the event of Decedent's death, the annuity funds would have been distributed in equal shares to them as beneficiaries. Decedent was divested of her ownership interest as had been the plan testified to by both Mr. McGinnis and Mr. Fortner. The "proceeds of income streams," as Mr. Fortner termed them, never materialized on Decedent's behalf because payments to Decedent were never initiated and because the annuity failed to increase in value prior to its surrender.

Mr. McGinnis also argues that "the only means by which Ms. Pomeroy could have obtained an interest in the underlying proceeds of the check would be as a gift to her." He thereby maintains that without clear and convincing evidence that either Decedent or Mr. McGinnis made an *inter vivos* gift to Ms. Pomeroy in the amount of half of the annuity funds, Ms. Pomeroy could not prove an ownership interest in half of the Check proceeds. *See In re Estate of Greene*, No. W2004-02910-COA-R3-CV, 2005 WL 2978991, at *3 (Tenn. Ct. App. Nov. 7, 2005) (explaining that to establish an *inter vivos* gift, "[t]he donee must prove both intent and delivery by clear and convincing evidence" (citing *Parsley v. Harlan,* 702 S.W.2d 166, 173 (Tenn. Ct. App. 1985))). We disagree with Mr. McGinnis on this point and determine that Ms. Pomeroy did not have to establish an *inter vivos* gift in order to establish her ownership interest in the annuity.

The fact that Decedent's funds were used to purchase the annuity does not change the fact that the annuity transaction divested Decedent of ownership and placed ownership with the parties to this action. Moreover, as Ms. Pomeroy notes on appeal, Mr. McGinnis's argument concerning lack of evidence of an *inter vivos* gift proffered by Decedent, if successful, would divest Mr. McGinnis of any ownership interest in the annuity funds as well. Furthermore, accepting Mr. McGinnis's assertion that Ms. Pomeroy had failed to prove that he had given her half of the annuity funds as an *inter vivos* gift would require us to make an illogical leap from his position that the funds belonged only to Decedent to the supposition that the funds somehow belonged to Mr. McGinnis to do with as he chose.

Mr. McGinnis further advances the argument that the situation in the instant action is analogous to property division in a divorce case, asserting that the parties' conduct, rather than title to the property in question, should govern. In support of his position, Mr.

McGinnis relies on decisions in which Tennessee appellate courts have analyzed the statutory scheme governing marital property distribution in a divorce. For instance, in *Jones v. Jones*, 597 S.W.2d 886, 887 (Tenn. 1979), our Supreme Court interpreted the phrase, "jointly owned," in the version of the statute applicable at that time to distribution or assignment of marital property, Tennessee Code Annotated § 36-825 (now codified at § 36-4-121 (2017)), determining that the phrase was "not the equivalent of 'jointly held'" property and therefore did not "limit the inquiry to interests represented by instruments of conveyance at law but include[d] every legal or equitable interest recognized at law or by equity in any kind of property held in the name of either party, or both parties . . . ." *See Cohen v. Cohen*, 937 S.W.2d 823, 833 n.12 (Tenn. 1996) ("For the purposes of property division in a divorce, '[i]n the final analysis, the status of property depends not on the state of its record title, but on the conduct of the parties.'" (quoting *Mondelli v. Howard,* 780 S.W.2d 769, 774 (Tenn. Ct. App. 1989))) (emphasis added). Mr. McGinnis presents no authority, and our research has revealed none, holding that the statutory scheme applicable to distribution of marital property in a divorce should govern ownership of an annuity jointly titled to two persons who are neither married to each other nor involved in divorce proceedings.

In contrast, we find this Court's decision in *Willocks v. Willocks*, No. E2012-00378-COA-R3-CV, 2013 WL 125927 (Tenn. Ct. App. Jan. 10, 2013), to be instructive. In *Willocks*, a divorce case, the husband had purchased an annuity "with funds from his separate assets" and had listed the wife as the primary beneficiary. *Willocks*, 2013 WL 125927, at *3. The trial court found that the annuity was the husband's separate property. *Id.* On appeal, the wife argued that even if the annuity had been the husband's separate property, "it became marital property by transmutation; i.e. by placing it in the name of both spouses." *Id.* This Court determined that the annuity had not become marital property, stating in pertinent part that the husband "was always listed as the owner of the annuity with wife as the beneficiary." *Id.* (emphasis added); *see also Reymann v. Reymann*, 919 S.W.2d 615, 618 (Tenn. Ct. App. 1995) (vacating a portion of the trial court's judgment that undertook to "convert an absolute property right" of the divorcing parties' adult daughter, who was not a party, in an annuity to which she had previously been named a joint owner with her father).

Similarly, we determine that the individuals possessing ownership interests in the subject annuity were the two individuals listed as owners, Mr. McGinnis and Ms. Pomeroy, who also happened to be the beneficiaries in this instance, and that the annuitant, Decedent, did not possess an ownership interest in the annuity funds once Mr. McGinnis and Ms. Pomeroy were named as owners. We note that as the titled owners of the annuity, Mr. McGinnis and Ms. Pomeroy became the payees of the Check issued by Sun Life upon surrender of the annuity as well. The trial court did not err in determining that Ms. Pomeroy possessed a one-half ownership interest in the annuity funds.

### B. Statute of Limitations

### 1. Applicable Statute

Mr. McGinnis also argues that the trial court erred by finding that Ms. Pomeroy's conversion action was not barred by the applicable three-year statute of limitations. Mr. McGinnis initially raised this affirmative defense in his answer to the complaint, although he did not specify the applicable statute at that time. In his memorandum in support of his motion for summary judgment, Mr. McGinnis asserted that Ms. Pomeroy's claim was barred by Tennessee Code Annotated § 28-3-105 (2017), which sets forth a general statute of limitations for conversion, providing in pertinent part:

> The following actions shall be commenced within three (3) years from the accruing of the cause of action:
>
> * * *
>
> (2)     Actions for the detention or conversion of personal property[.]

*See also PNC Multifamily*, 387 S.W.3d at 556 ("Conversion is subject to the three-year statute of limitations set out at Tennessee Code Annotated Section 28-3-105 . . . ."). The trial court referenced "[t]he applicable statute of limitations, under any applicable code section" in its order denying Mr. McGinnis's motion for summary judgment but did not specify the statute in either its summary judgment order or final order. On appeal, Mr. McGinnis correctly notes that "[a] specific statute of limitations for the conversion of a negotiable instrument is established by Tenn. Code Ann. § 47-3-118(g)."

Insofar as Ms. Pomeroy's claim alleging conversion of her portion of the Check proceeds alleges conversion of a negotiable instrument, we determine that the claim is subject to the specific statute of limitations as set forth in Tennessee's codification of the Uniform Commercial Code ("UCC") at Tennessee Code Annotated § 47-3-118(g) (Supp. 2019). *See C-Wood Lumber Co. v. Wayne Cty. Bank*, 233 S.W.3d 263, 283 n.53 (Tenn. Ct. App. 2007) ("The three-year general statute of limitations for conversion claims in Tenn. Code Ann. § 28-3-105 must yield to more specifically applicable statutes of limitations like Tenn. Code Ann. § 47-3-118(g) . . . ."). Similarly setting forth a three-year statute of limitations, Tennessee Code Annotated § 47-3-118(g) provides:

> Unless governed by other law regarding claims for indemnity or contribution, an action (i) for conversion of an instrument, for money had and received, or like action based on conversion, (ii) for breach of warranty,

or (iii) to enforce an obligation, duty, or right arising under this chapter and not governed by this section must be commenced within three (3) years after the cause of action accrues.

As our Supreme Court has instructed, however, "whether applying Section 118(g) or Section 28-3-105, the considerations are the same because the claim is the same— conversion of a negotiable instrument" and additionally because "the Comments to Section 118(g) provide that the section 'follows general law in stating that the period runs from the time the cause of action accrues.'" *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 621 (Tenn. 2002).

In general, "[w]hen the property converted is a negotiable instrument, the damage is done, and the tort is complete when the instrument is negotiated, regardless of the plaintiff's ignorance of the conversion." *Id.* at 623. In this case, it is undisputed that on April 26, 2012, Mr. McGinnis endorsed the Check by signing his name and Ms. Pomeroy's name and that he then negotiated the Check by depositing it initially into the joint checking account that he held with Sondra McGinnis. Ms. Pomeroy did not file the instant complaint until more than seven years later on May 7, 2019, well beyond the statutory limitations period.

In *Pero's Steak & Spaghetti House*, the High Court was faced with the question of whether the discovery rule applies to toll the three-year statute of limitations for conversion of a negotiable instrument. *Id.* at 616. "[W]here applicable, the discovery rule is an equitable exception that tolls the running of the statute of limitations until the plaintiff knows, or in the exercise of reasonable care and diligence, should know that an injury has been sustained." *Id.* at 621 (citing *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994)). The Court held:

> [W]e hold that the discovery rule does not apply to toll the statute of limitations for claims of conversion of negotiable instruments. In the absence of fraudulent concealment, such claims accrue and the statute begins to run when the instrument is negotiated. This conclusion applies to the former statute, Tennessee Code Annotated section 28-3-105, as well as the current statute, Tennessee Code Annotated section 47-3-118(g).

*Pero's Steak & Spaghetti House*, 90 S.W.3d at 624. Therefore, as the trial court found in this case, Ms. Pomeroy's conversion claim was barred by the statute of limitations unless she could demonstrate that Mr. McGinnis had fraudulently concealed the cause of action from her, tolling the statute of limitations to within three years of the date Ms. Pomeroy filed her complaint.

## 2. Fraudulent Concealment

Mr. McGinnis contends that the trial court erred in finding that he fraudulently concealed this cause of action from Ms. Pomeroy. He specifically argues that (1) he "was under no duty to disclose to Ms. Pomeroy that he had endorsed her name to the Check," (2) "there is no evidence that he employed any artifice or deception to prevent Ms. Pomeroy from gaining knowledge of his having signed her name to the check," and (3) Ms. Pomeroy had opportunities to discover that she may have had a cause of action because she was residing "in the same household" as Mr. McGinnis and Decedent "for at least six years after the annuity was purchased and for at least two years after the annuity was surrendered and check was cashed." Upon careful review, we disagree.

In initially analyzing fraudulent concealment as it pertains to the statute of limitations in this action, the trial court relied in its summary judgment order on our Supreme Court's analysis in *Pero's Steak & Spaghetti House*, which set forth the elements of fraudulent concealment as follows:

> [T]o establish fraudulent concealment, a plaintiff must prove the following: (1) that the defendant took affirmative action to conceal the cause of action or remained silent and failed to disclose material facts despite a duty to do so; (2) that the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence; (3) that the defendant had knowledge of the facts giving rise to the cause of action; and (4) that the defendant concealed material facts from the plaintiff by withholding information or making use of some device to mislead the plaintiff, or by failing to disclose information when he or she had a duty to do so.

90 S.W.3d at 625 (citing *Shadrick v. Coker*, 963 S.W.2d 726, 735-36 (Tenn. 1998)). As Ms. Pomeroy acknowledges on appeal, as the plaintiff, it was her burden to prove both that Mr. McGinnis "took affirmative action to conceal her cause of action from her" and that "she could not have discovered her cause of action despite exercising reasonable diligence." *See Hanna v. Sheflin*, 275 S.W.3d 423, 428 (Tenn. Ct. App. 2008).

The trial court in its summary judgment order found that the first, third, and fourth elements of fraudulent concealment had been satisfied beyond any genuine issue of material fact as follows:

> Certainly factors (1), (3) and (4) are easily met by the facts that [Mr. McGinnis] received a check made payable to he and [Ms. Pomeroy] as title owners of an annuity; that [Mr. McGinnis] never informed [Ms. Pomeroy] of either the surrender of the annuity (which would result in the payment of

the proceeds of the annuity to [Ms. Pomeroy] and [Mr. McGinnis]) or of a check issued to [Ms. Pomeroy] containing funds from an annuity under which she was a [titled] owner[]; that [Mr. McGinnis] endorsed [Ms. Pomeroy's] name to the check with no authority from or knowledge by [Ms. Pomeroy]; that [Mr. McGinnis] deposited those funds into his own personal account; and that [Mr. McGinnis] then disbursed all of those funds from his account without informing [Ms. Pomeroy] of the same.

On appeal, Mr. McGinnis does not dispute the factual findings quoted above, and although he disputes whether the facts satisfy the first and fourth elements, he does not dispute the third element, namely that he had knowledge of the facts underlying the cause of action.

In its final judgment, the trial court credited Ms. Pomeroy's testimony that she knew nothing concerning either the purchase of the annuity or its surrender. At trial, Mr. McGinnis testified that the surrender form had signature spaces for both Ms. Pomeroy and him and that both had signed the surrender form. However, Mr. McGinnis acknowledged that he had been unable to obtain a copy of the signed surrender form. Mr. McGinnis testified that when the Check arrived in the mail, he "endorsed it," "signed [his] sister's name to the same check," and deposited it in the bank account he then shared jointly with Sondra McGinnis. Mr. McGinnis also acknowledged at trial that he subsequently transferred the Check funds from the joint account to an individual account he owned, stating that he did so "in order to separate it."

Concerning the first and fourth elements of fraudulent concealment, both of which require that a duty exist on the defendant's part to disclose material facts to the plaintiff, *see Pero's Steak & Spaghetti House*, 90 S.W.3d at 625, Mr. McGinnis argues that he had no duty to disclose to Ms. Pomeroy that he had signed her name to the Check without her permission and deposited the resultant funds in an account to which she had no access. We note that intent aside, Mr. McGinnis's action in signing Ms. Pomeroy's name as an endorsement of the Check without disclosing the existence of the Check to her essentially amounted to forgery. *See* Tenn. Code Ann. § 39-14-114(b)(1)(A)(i) (2018) (defining "forge" in relevant part as to "[a]lter, make, complete, execute or authenticate any writing so that it purports to [b]e the act of another who did not authorize the act[.]"). We emphasize that we make no determination as to the level of "intent to defraud" that would be required to meet the full criminal definition of forgery, *see id.*; however, by Mr. McGinnis's own admission, he took it upon himself to endorse the check in Ms. Pomeroy's name when she did not authorize the action and indeed had no knowledge of the Check's existence.

Mr. McGinnis's argument that he had no duty to disclose his actions to Ms. Pomeroy is based primarily on his contention that Ms. Pomeroy had no ownership interest in the Check proceeds. He asserts that because Ms. Pomeroy's "participation [was] entirely passive" in becoming a joint title holder of the annuity, he had no duty "to disclose facts about the transaction to her." To the contrary, having determined that Ms. Pomeroy was a co-payee on the Check and possessed a one-half ownership interest in the proceeds, we further determine that Mr. McGinnis had a duty as the other co-payee to inform Ms. Pomeroy of the Check's existence and, of course, to refrain from endorsing the Check in her name without her authorization. We note also that Mr. McGinnis's argument in this regard runs contrary to his insistence at trial that Ms. Pomeroy had signed the original application form for the annuity and particularly his testimony that she had signed the surrender form. The trial court in its final judgment expressly found Mr. McGinnis's testimony not to be credible in this regard.

In support of his argument that he had no duty to disclose material facts of the Check transaction, Mr. McGinnis also relies on this Court's decision in *Odom v. Oliver*, 310 S.W.3d 344, 349 (Tenn. Ct. App. 2009), for the proposition that "[a] party commits fraudulent concealment for failing to disclose a known fact or condition where he had a duty to disclose and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." Mr. McGinnis asserts that he could not have had a duty to disclose the material facts concerning the annuity proceeds and the Check because Ms. Pomeroy did not know anything about the transaction and therefore could not reasonably have relied on Mr. McGinnis to learn the status of the annuity funds. We find *Odom* to be highly factually distinguishable from the case at bar.

In *Odom*, home buyers alleged, *inter alia*, that the sellers had committed fraudulent concealment by violating a duty to disclose the original log-frame construction of the home at issue before the parties had entered into a sales contract. *See Odom*, 310 S.W.3d at 349-52. In contrast to a contract action such as the one at issue in *Odom*, the instant action involves co-owners of an annuity, surrender of that annuity, endorsement of a check with both payees' signatures required, and the deposit of the resultant funds in an account controlled by only one of the payees. Once Ms. Pomeroy was named a co-owner of the annuity, her authorization was necessary for surrender of the annuity and subsequently for proper endorsement of the Check representing the annuity's proceeds. We determine that Mr. McGinnis did not have the authority to surrender the annuity or cash the Check without Ms. Pomeroy's authorization, giving rise to a duty to inform her, as his co-owner and co-payee, of the transaction.

Mr. McGinnis also argues that no evidence demonstrated that he had "employed any artifice or deception to prevent Ms. Pomeroy from gaining knowledge of his having signed her name to the check." Assuming, *arguendo*, that forging Ms. Pomeroy's

signature was not an "artifice or deception," we note that "remain[ing] silent and fail[ing] to disclose material facts despite a duty to do so" satisfies the first element required for fraudulent concealment and that "failing to disclose information when he . . . had a duty to do so" satisfies the fourth element. *See Pero's Steak & Spaghetti House*, 90 S.W.3d at 625. We determine that the evidence preponderates in favor of the trial court's finding that these elements were satisfied by Mr. McGinnis's actions in receiving the Check, endorsing it with both co-owners' signatures, depositing the funds into an account to which the other co-owner had no access, and disbursing the funds from that account.

We now turn to the second element of fraudulent concealment and the last one at issue: whether Ms. Pomeroy could not have discovered the cause of action despite exercising reasonable care and diligence. *See id.* Mr. McGinnis argues that by virtue of her presence in the household, Ms. Pomeroy could have discovered the material facts leading to this cause of action through reasonable care and diligence. In contrast, the trial court found that Ms. Pomeroy had "played no role at all in the finances of her mother." In so finding, the trial court expressly credited Ms. Pomeroy's testimony "concerning not being present for anything or knowing about anything" regarding the annuity. The court noted a factual dispute regarding Mr. Fortner's initial deposition testimony and Mr. McGinnis's testimony that Ms. Pomeroy had signed an application document for the annuity, as well as Mr. McGinnis's testimony that Ms. Pomeroy had signed the surrender form. However, in addition to finding Mr. McGinnis not to be credible in this regard, the court found that Mr. Fortner's testimony as it related to the initial meeting at Mr. McGinnis's home in 2006 and the signatures on the application form did not inspire confidence, observing that Mr. Fortner had not recollected "much of anything and was doing his best to review whatever documents he had to give his testimony." The court thereby found that Ms. Pomeroy "could not have discovered the cause of action despite exercising reasonable care and diligence because she did not even know the transaction had occurred."

We emphasize that the trial court's credibility determinations are not to be disturbed on appeal absent clear and convincing evidence to the contrary. *See Morrison*, 338 S.W.3d at 426. Moreover, we conclude that the evidence preponderates in favor of the trial court's finding that Ms. Pomeroy could not have discovered the cause of this action sooner than she did despite exercising reasonable care and diligence. We therefore conclude that Ms. Pomeroy's conversion claim was not barred by the applicable statute of limitations.

### C. Judgment on Conversion Claim

Having addressed Mr. McGinnis's issues concerning Ms. Pomeroy's conversion claim and having determined that Ms. Pomeroy possessed a one-half ownership interest

in the Check proceeds and that her claim was not barred by the statute of limitations, we further determine, upon a thorough review of the record, that the trial court did not err in granting a judgment in favor of Ms. Pomeroy on her conversion claim. However, we take this opportunity to correct a mathematical error in the judgment.

The trial court awarded to Ms. Pomeroy $38,568.93, representing half of the Check proceeds, plus $21,105.29 in prejudgment interest. Although the balance of these two amounts equals $59,674.22, the trial court awarded a total judgment in the amount of $59,764.22. We therefore modify the judgment to reduce it by $90.00, awarding to Ms. Pomeroy a total judgment in the amount of $59,674.22.

## V. Unjust Enrichment

Mr. McGinnis also contends on appeal that Ms. Pomeroy's claim of unjust enrichment is not applicable to the facts of this case. In response, Ms. Pomeroy asserts that her "claim for unjust enrichment was an alternative theory in the event [that her] claim for conversion was not successful." We agree with Ms. Pomeroy on this point. In her complaint, she alleged that "[i]n the alternative," Mr. McGinnis had been "unjustly enriched by his actions in the same amount" as the amount sought in her conversion claim. The trial court made no findings specific to the alternate unjust enrichment claim in either its order denying summary judgment or its final order granting a judgment in favor of Ms. Pomeroy. As such, we determine that this issue is not properly before us on appeal. *See Dorrier v. Dark*, 537 S.W.2d 888, 890 (Tenn. 1976) (explaining that this Court is one "of appeals and errors," and that "we are limited in authority to the adjudication of issues that are presented and decided in the trial courts.").

## VI. Attorney's Fees on Appeal

In the argument section of her responsive brief on appeal, Ms. Pomeroy has included a subsection entitled, "Award of Attorney Fees on Appeal," wherein she requests that this Court award attorney's fees as damages for defending against a frivolous appeal pursuant to Tennessee Code Annotated § 27-1-122 (2017). Although Ms. Pomeroy has included this subsection title in her table of contents, she has not included a separate statement of the issues in her brief and has not therefore raised attorney's fees on appeal in a statement of the issues. As our Supreme Court has explained:

> Appellate review is generally limited to the issues that have been presented for review. Tenn. R. App. P. 13(b); *State v. Bledsoe*, 226 S.W.3d 349, 353 (Tenn. 2007). Accordingly, the Advisory Commission on the Rules of Practice and Procedure has emphasized that briefs should "be

oriented toward a statement of the issues presented in a case and the arguments in support thereof." Tenn. R. App. P. 27, advisory comm'n cmt.

*Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012); *see also Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) ("We may consider an issue waived where it is argued in the brief but not designated as an issue."). Therefore, we deem Ms. Pomeroy's request for attorney's fees on appeal to be waived.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's judgment with one modification to reduce the amount awarded by $90.00, rendering a total judgment awarded to Ms. Pomeroy in the amount of $59,674.22 rather than $59,764.22. The trial court's judgment is affirmed in all other respects. We remand this case for enforcement of the judgment as modified and collection of costs below. Costs on appeal are taxed to the appellant, Michael L. McGinnis.

s/ Thomas R. Frierson
THOMAS R. FRIERSON, II, JUDGE