A Vester **PARSLEY, Jr., Administrator Pendente Lite; Gerard W. Harlan and Sheralynn Williams, Plaintiffs-Appellants,**

v.

**Norma Jean HARLAN,
Defendant-Appellee.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

July 11, 1985.

Rehearing Denied Aug. 23, 1985.

Application for Permission to Appeal
Denied by Supreme Court
Nov. 18, 1985.

Fred E. Cowden Jr., J. Mitchell Grissim, Jr., Nashville, for plaintiffs-appellants.

Proctor Upchurch, Crossville, Bratten H. Cook, Smithville, for defendant-appellee.

## OPINION

LEWIS, Judge.

This suit was brought by plaintiffs, the Administrator *pendente lite* of the Estate of Eugene H. Harlan, deceased, and Mr. Harlan's two surviving children, Gerard W. Harlan and Sheralynn Williams, against the defendant, Norma Jean Harlan, the surviving spouse of Eugene H. Harlan to recover certain mineral interests.

The complaint alleged that at the time of his death Mr. Harlan was the owner of certain mineral leases, rights and property described in a book on inventory containing some 300 pages, and that the defendant refused to turn over to the Administrator these assets, as well as certain other assets of the estate.

In her answer, defendant alleged that on June 19, 1981, Mr. Harlan executed an instrument creating a joint tenancy in the mineral leases and rights with the right of survivorship, and that, by virtue of that instrument, all right, title and interest to the property passed to her at the time of Mr. Harlan's death.

Subsequent to an evidentiary hearing, the Chancellor found that the June 19th instrument created a joint tenancy in Mr. Harlan and defendant with the right of survivorship in all the mineral leases and rights in Texas, Arkansas, Kansas, Kentucky, Louisiana and Oklahoma, but that the instrument did not convey any interest in United Royalty Corporation nor any other mineral leases owned by Mr. Harlan.

The facts are as follows: Eugene H. Harlan died on January 31, 1982. Surviving him were his widow, defendant Norma Jean Harlan, and two adult children, the plaintiffs Gerard W. Harlan and Sheralynn Williams, of a previous marriage.

In February, 1976, Mr. Harlan had his first stroke and was hospitalized from the middle of February to March 10, 1976. During the years 1976 and 1981, he suffered several "mini strokes." He remained under the care of a physician from 1976 until his death in 1982 and was seen at least monthly by his physician during this period.

On December 14, 1979, Mr. Harlan executed a general power-of-attorney appointing defendant his attorney-in-fact. Defendant served as attorney-in-fact until Mr. Harlan's death.

Mr. Harlan was the owner of mineral interests located in Texas, Arkansas, Kansas, Kentucky, Louisiana and Oklahoma.

On June 19, 1981, he executed the following instrument.

PERSONALLY APPEARED, before me, the undersigned Notary at Large, EUGENE H. HARLAN, and upon his oath, deposes and says:

THAT he is the owner of Mineral and Oil Leases being situated in Texas (19 counties approximately), Arkansas, Kansas, Kentucky, Louisiana and Oklahoma; THAT he purchased these Mineral Interest from his own father in 1952; FURTHER, that he is very ill with heart disease and the work of assessing and setting up in book form has fallen entirely upon his wife, NORMA JEAN HARLAN.

FURTHER, IT IS THE WISH OF Eugene H. Harlan, by the execution of this instrument, that his wife be considered to own these Mineral interests with him as Joint Tenants, with the right of Survivorship; that this Affidavit will suffice to be filed in the appropriate counties and will stand as indeed a Mineral Deed.

FURTHER, it is the wish of Eugene H. Harlan that his wife be considered to have full power and authority over the now existing producing royalties; that she have the power to sell, assign and convey, if she deems it necessary; that she have full power and authority to sell the non-producing mineral interest or retain them, whatever suits her best. By this Affidavit, Eugene H. Harlan, gives to his wife, to be hers absolutely upon his death, all the right, control and ownership of what was United Royalty Corporation, a Missouri corporation, as well as all interest Eugene H. Harlan had in and to the Mineral Interest that may or may not be in the name of United Royalty Corporation, a Missouri corporation, and conveys, upon his death, full right and title to the mineral interest in his name solely. It is further the wish of Eugene Harlan, that no one cause his wife any problem in carrying out the wishes of Eugene H. Harlan.

DATED THIS the 19th day of June, 1981, and signed in the presence of two witnesses.

/s/ Eugene H. Harlan
EUGENE H. HARLAN

/s/ Jimmy Hewlett
/s/ Elizabeth Parkerson

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 19th day of June, 1981

(SEAL) /s/ Nola Walker
 Notary at Large

My commission expires: 8–29–84

On September 21, 1981, Mr. Harlan executed the following affidavit:

I, EUGENE H. HARLAN, being of sound mind and aware of the properties I own and the disposition I am about to make, as evidenced by my signature and the signature of witnesses hereon, do hereby give to my wife, Jean Harlan, the absolute authority to sell the mineral interests I hold in the following states: Texas, Arkansas, Kansas, Kentucky, Louisiana and Oklahoma, for the sum of Ten Million Five Hundred Thousand Dollars ($10,500,000.00).

In Witness Whereof, I have set my signature, along with those who witnessed my signature by their signature hereon, this _21_ day of September, 1981.

/s/ Eugene H. Harlan
EUGENE H. HARLAN

Cardiologist, Prof. of Medicine
Vanderbilt Hospital
Nashville, Tennessee
ADDRESS
Woodmont Baptist Church
Nashville, Tennessee
ADDRESS

/s/ James M. Perry, Jr.
JAMES PERRY, M.D.

/s/ Bill Sherman
BILL SHERMAN, PASTOR

Mr. Harlan and defendant were married and divorced. They remarried on August 27, 1974. In 1977, Mr. Harlan and defendant filed separate divorce actions, and both were later dismissed. In June, 1980, defendant again instituted a divorce action against Mr. Harlan. As a result of this action, Mr. Harlan contacted Mr. Gareth Aden, an attorney in Nashville. Mr. Aden had represented Mr. Harlan in the 1977 divorce actions. Mr. Harlan requested of Mr. Aden that he represent him in the 1980 suit. Because of his poor health, Mr. Harlan requested that Mr. Aden come to Alexandria on June 24, 1980. Defendant called and cancelled this appointment, and, according to Mr. Aden, he became concerned that defendant was keeping Mr. Harlan from seeing his attorney. Mr. Aden traveled to Alexandria on June 26th to see Mr. Harlan to determine his physical condition. Defendant refused to allow Mr. Aden to see Mr. Harlan. Mr. Aden then filed a petition seeking to be allowed to consult with his client. Following the filing of the petition, defendant dismissed her divorce action.

Mr. Harlan was an invalid for the last one and a half to two years of his life. While he was not totally bedridden, he was unable to walk without assistance. A letter written by defendant to Barbara Harlan, wife of plaintiff Gerard Harlan, on September 9, 1980, describes Mr. Harlan's condition.[1]

1. The letter introduced into evidence by plaintiffs is as follows:

Dear Barbara:

To enlarge on our phone conversation, I do not now or ever object to Sherry and Gerry seeing their father, for I truly feel that they should make an effort to see him more often and for longer times. However, this is their decision not mine. I do have to have some things governed, for I am worn out 99% of the time. I do not have help on weekends, other than early on Saturday morning, Avin will come in to see if he can go to the store, etc. for me. The rest of the time, I am alone with Gene and have the full care and responsibility resting on me. Gene is dead weight now and lifting him takes a terrible toll on my body, arms and neck. When I start to get him up, I tell him to put his arms around my neck and leave them there, but he will try, no matter what, to reach out thinking that he is helping me and this throws me off balance and the strain to hold him upright is terrible on my neck. Once he did this and he and I were both off-balanced and I dropped him (thank goodness on a pillow) and then was falling myself and in trying not to fall directly on him, caught the metal foot rest of the wheel chair on the left leg, which is the one that has the pins in it, and the damage done to it was terrible. Gene cannot catch himself at all, and this is when he gets hurt so badly.

The main worry that we have is trying to make him see that he cannot walk and to try usually causes him to have hurt ribs, back, legs, or whatever. He has been *VERY* lucky up to now in having broken nothing. I am, however, afraid that this will not keep up this not breaking. He was told and told plainly by the doctor and in front of two other persons that if he broke a hip, back, or whatever, that it is very doubtful if he would survive an operation. He has no circulation at all to speak of, is very thin and the muscle covering his bones is gone. It is so dangerous for him to try to walk unaided, but you know Gene, he has never listened to anyone and will not listen now. The fear that I feel when going into the room and finding him on the floor is totally devestating [sic]!

I am going to set out just a little bit of what one week is like around here ....... keeping in mind that I am around him 24 hours a day....

He is bathed everyday, either by hand in the bed or taken out of the bed on Tuesday, Thursday, Saturday and Monday, wheeled to the bath room, put on a stool, padded with two towels. I then shave him with a straight razor, wetting his hair and putting shampoo on the head. Avin comes into the bath and lifts him into the shower onto a stool that has a towel draped on it. The bath room heat, by the way is on, and it is well over 100° in the room at this time. While he is in the shower, Avin is fixing his grapefruit, (already having stripped the bed while I am shaving and shampooing him) and I am finishing making up the bed, and collecting dirty clothes. I get out his clean pajamas and socks, plus two clean towels, and we go into the hot, hot bathroom that now has moisture in the air and we both get him out of the shower and frantically dry him off for his body by then is shaking. We massage lotion all over him, looking for any breaks in the skin, and if his toenails need cutting, I do them. I dress him on the lower part, kneeling to put the socks and p.j.'s on his bottom, Avin rubbing his back hard and with lots of lotion and putting his top on. I brush his hair, and go and get the wheel chair..... we take him back to the bedroom, wrap him in a fake fur robe, and I stand there and feed him his grapefruit while Avin cleans the potty chair, the pee pots with pinesol and uses a pinesol soaked rag to wipe up the mantle wherein his pills set, and wipes the headboard of the bed. We then give him his pills, Avin gets the bedpan, glass with water, toothbrush with

toothpaste, and I get a glass with Hydrogen peroxide and scope in another glass. Teeth are then brushed, Avin gets him into the bed, while I am running the VAC, then rubbing his back again, we put a pillow under his lower legs, cover him and let him rest. We have done all this in less than one hour and 30 minutes. We have had to strip the bed for Gene averages wetting at least twice a day and then this means bed down to the rubber sheet (it too), the bed pad, two sheets, sometime the blanket, at least 8 towels every day of this world. I am exhausted, as you can guess. Even when I do not get him up and put into the shower, water is taken to the bedroom and I bathe him with stuff in the water to prevent sores from starting, and his p.j.'s are changed and the bed changed everyday, no matter if he wet or not. As I said, the bed is usually wet tho.

To get him up out of the bed means, lifting him to a sitting position, putting his robe on him, lifting him to a standing position and lowering him into a wheel chair, straightening the bed (hopefully do not have to change it), brushing his hair, giving him a warm wash rag to clean his face and hands, and wheeling him to the family room, again lifting him out of the wheel chair, and lowering into the chair, covering him up, putting stool under his feet, pillows at his back and side, pillow behind his head, hand him the paper, and retire to the kitchen to get his meals. Putting book in lap, covering with two towels, and tray over his lap, bringing food to chair and helping him cut, if necessary, and see that he has a napkin, etc. After feeding, he has to be cleaned up, tray removed, and chair adjusted. When he gets tired, back to bed and reverse the lifting, etc. All total, one time up means 8 times that I have to lift him.

I have to give him enemas, and this means at least two times on the potty chair, cleaning his butt, carrying the potty to the bathroom and flushing down the drain, putting pinesol in the bucket and cleaning it, and then putting fresh pinesol back into the bottom and mixing with hot water, and taking to the bedroom and putting, after cleaning the frame of the chair, back together. He brushes his teeth at least twice a day, takes pills twice a day, has to have water, juice, coke, etc. all day long. Every meal that he eats, I have to prepare, and you know Gene, it is not potatoes and beans. I rack my brain trying to come up with food that he will like and eat without fussing. I have to cut his fingernails, trim his moustash(?); clip the hair out of his ears, and put bandaids on his body when he tears his skin.

All this is just for him and is for an everyday process..... you will note that I have done nothing for myself. At bedtime I have to see that the house is locked up, that water is taken to the bedroom, pills laid out, tissue out, potty chair and pee pots on hands, and if the T.V. is on, I have to turn it out!

My personal care of myself is done on a hit-and-run basis, using as little time as possible yet getting clean. What I would not give to lay back in a lovely tub of hot water full of bathoil! Also you will note that none of the above mentions the washing! We use one and one-half of the large ($6.00+) Tide powders a week, plus the softner! I do wash everything every weekend, but do not fold and it is two large baskets above the windows by the time that Monday rolls around. On Sunday last, it was 3:30 before I sat down for the first time in order to watch football or the tennis match! You will further note that nothing has been said about keeping the house clean, groceries being shopped for, paying bills, keeping the books, doing the necessary letters to the ones necessary, mowing the yard, clipping the yard, canning, freezing, seeing that the car stays in good order to get him to the hospital, if necessary. Fighting the insurance companies about paying bills, supervising hired help, and having some time to myself. This last is an impossibility! Gene wants me there no matter what! This loss of my personal freedom is the hardest thing that I have to combact [sic]. Even when he is alseep [sic], he seems to know when I am in the house or out of it. He is satisfied when I am in or near the house but somehow knows when I am going to the grocery store and becomes very difficult for the persons here taking care of him.

The main thing, he will pay no attention to anyone but me, and he listens to me because he has to but he does not like it! No one will say, "But Mr. Harlan, you cannot do this or that!" I do tell him and do let him have it when he gets out of bed and falls ... he must stop this! The rails were put up to keep him from hurting himself, but he has taken the opposite view of this.... they were up to box him in! But, then anytime that it happens, the fall, I know that I am correct in keeping him from being able to get out of bed without buzzing one of us. I know that it is so hard for a man of Gene's temperment to ever accept loss of his body functions.... but that is the way that it is. It is not the use of my body, nor me falling, nor the possibility of breaking my back that is the problem, it is Gene's problem. I have had my leg broken and broken very badly and I know that I still have and will continue to have for the rest of my life, trouble. If I have this at 48, what it must be like at 73? But, it again is hard to make Gene see what he is facing if he breaks something!

I can manage to have one person, probably two, if there is help, here for the weekend, and Barbara I would have no trouble asking you to help me. But I cannot see myself asking Sherry or Gerry to help me in any way......

Perhaps, if you came too Barbara that it might work out, for you have always helped when you have been around us, and I am sure that you would this time too.

I have to go, it is so early and I have so much to do...... it is so hot still and I for one will be glad to see cooler weather.... I like winter much better anyway ...

There is evidence in the record that in December, 1980, Mr. Harlan "appeared to ... be in a drugged state" and was unable to "hold a conversation," and that at Mr. Harlan's birthday party in 1981, his condition had "deteriorated." There is evidence in the record that Mr. Harlan was not always lucid; that he was kept away from other people, especially members of his family by the defendant; and that defendant would not allow his son and daughter to talk with him by phone.

However, there is also evidence that, despite his physical disabilities, Mr. Harlan was lucid and competent until the time of his death, and that he was "very independent, very facinating" and "definitely" the man of the house.

We will discuss other facts under the separate issues as they apply to those issues.

The plaintiffs have appealed from the Chancellor's finding that Mr. Harlan "was mentally competent up to the time of his death," that "plaintiffs' allegations of undue influence or duress or overreaching being practiced upon [Mr. Harlan] by the defendant, Norma Jean Harlan, is without merit," and "that the affidavit of June 19, 1981, is a valid deed of conveyance from the deceased, Eugene H. Harlan, to his wife, Norma Jean Harlan, to all those mineral and oil leases and royalties therefrom, owned by him and held by him in his name, situated in the states of Texas, Arkansas, Kansas, Kentucky, Louisiana and Oklahoma only."

Plaintiffs' first issue is:

The Defendant Should Not Have Been Permitted To Introduce A Copy Of The Alleged Deed of June 19, 1981, Since The Same Constituted Secondary Evidence And It Was Clear From The Statements Of Counsel For The Defendant At The Trial That The Original Was in The Possession And Under The Control Of The Defendant.

The storm blew almost all my pears off the tree and I do so want to make pear preserves.....

Defendant testified regarding the preparation and execution of the "Mineral Deed." She then offered a copy of it as an exhibit. Plaintiffs objected on the basis that the original was the best evidence, and that there had been no showing that the original was not available.

Defendant's counsel stated that "I think we can provide" the original. Defendant stated that the original was probably at home. Defendant's counsel then stated: "We can produce the original or else we will certainly show why we can't." The Court then allowed the "Mineral Deed" into evidence subject to its later being stricken.

At a later point in the trial, defendant, testifying in regard to the mineral lease, was unable to state that she saw Mr. Harlan sign the instrument.

The following colloquy then occurred between counsel and the Court:

MR. UPCHURCH: May we have Exhibit 14?

THE COURT: Did you ever locate the original of that?

MR. UPCHURCH: Yes, your Honor. I have located the original. It will not be back in my office until this afternoon. I will advise the Court now that I will tender the original. The only thing I presently have is a copy.

And it's through no one's particular fault, but it got away. It will be back.

MR. GRISSIM: For the record, your Honor, we will interpose an objection here. If they have got the original, I would like to see it brought forward.

MR. UPCHURCH: I don't have it physically, your Honor. I will bring it forward. It will be in Mr. Cook's office late this afternoon.

THE COURT: Well, they have a right to examine the original and cross-examine the witnesses.

MR. UPCHURCH: Your Honor, this is a zerox copy.

Let me hear from you.
/s/ Jean

MR. GRISSIM: Your Honor, as far as zerox copies go, that last exhibit that had Dr. Sherman's signature on it, we've got a copy of the same exhibit with an additional signature on it. And I'm not real satisfied with the copies in this case. I would like to see the original.

MR. UPCHURCH: Your Honor, the only thing I can do is to put on the—I will tender this for identification and ask the Court to permit me to substitute an original. And then if during the cross-examination, there is some particular portion they wish to cross-examine on, I will tender this witness again.

But it was through no fault of anyone. It just was simply out of my hands and it's coming back in and being delivered to Mr. Cook's office. And I made arrangements for delivery late this afternoon on the assumption that the case was going to last that long. But it appears now that it may well not do so.

THE COURT: Well, why can't it be delivered before late this afternoon?

MR. UPCHURCH: It is coming in from out-of-state.

After argument of counsel, the Court then allowed the document to be introduced for identification purposes only and gave the defendant five days in which to file the original, with leave to plaintiffs to cross-examine if they wished after the original was introduced.

On December 20, 1983, defendant's counsel notified plaintiffs' counsel that they would appear on January 6, 1984, before the Chancellor and request that the original be treated as a "lost instrument."

In support of their motion, they filed the affidavit of defendant in which she states that she had the "Affidavit-Mineral Deed" in her possession prior to and immediately after the death of Eugene Harlan; that "during the month of May, 1982, I had copies of this Affidavit-Mineral Deed recorded in various counties in Texas and other states mentioned in the Affidavit;" and that it was her belief during the trial of this case that she had the original in her possession but, after making a "due and diligent search through all of my documents, I cannot find the original. It is my sincere belief that the original was lost somewhere during the course of my mailing it to the various counties in Texas, Arkansas, Kansas, Kentucky, Louisiana, and Oklahoma." Her affidavit further states that the copy which was introduced for identification purposes only was "an exact true and accurate copy of the original," and that she did not destroy the original nor have anything to do with its destruction, nor contribute to the document being "misplaced, lost, or destroyed."

The Chancellor, at the conclusion of the January 6th hearing, found that the "affidavit of June 19, 1981, had been lost and/or misplaced and that the Court therefore will permit the filing of certain copies of said affidavit."

Plaintiffs correctly contend that a copy of an instrument is not admissible where the original is in the power and possession of the party who seeks to introduce the copy. *Saunders v. Harris*, 24 Tenn. (5 Hum.) 345, 346 (1844). A certified copy of a deed is competent and admissible evidence when the absence of the original is satisfactorily accounted for. *Anderson v. Walker*, 8 Tenn. (1 Mart. & Yer.) 200 (1827).

In this case defendant has satisfactorily shown that she had the original, that she made a diligent search for the original, and that she did not destroy or contribute to the loss or misplacement of the original, but believes it was lost in mailing among the various counties for registration.

Our review of the record fails to show that the Chancellor erred in admitting certified copies of the "Mineral Deed" into evidence.

This issue is without merit.

We discuss together the plaintiffs' second, third and fourth issues which raise the proposition that the defendant failed to show by clear and convincing evidence that the "Mineral Deed" was, in fact, delivered and accepted and that Eugene Harlan, the donor, still treated the subject matter of

the gift as his own after the alleged transfer.

To establish a gift there must be evidence free from personal interest and not equivocal in character that the property claimed was delivered to donee during the donor's life, and this rule is not met by the possession of the property, where the possessor has had an opportunity to acquire the possession by other means. *Atchley v. Rimmer,* 148 Tenn. 303, 312, 255 S.W. 366 (1923). The gift must be shown by clear and convincing evidence. *Ingram v. Phillips,* 684 S.W.2d 954 (Tenn. App.1984).

They insist that the actions of defendant belie the fact of a gift in this case. The evidence is that the defendant made no effort to record the "Mineral Deed" in any of the counties in which the mineral leases or rights existed until some three and a half months after Mr. Harlan's death. Before Mr. Harlan's death, neither he nor defendant contacted any of the oil companies to inform them that the "mineral rights had been transferred to a joint tenancy with the right of survivorship...." After Mr. Harlan's death, defendant did not rely on the "Mineral Deed" as evidence of ownership but "attempted to rely on the false affidavits and statement to the effect that [Mr. Harlan] had died leaving the defendant as his sole heir." Defendant filed affidavits with some of the oil companies after Mr. Harlan's death in which she stated that he died leaving no children and she was his only heir. However, in at least one of the affidavits she did state: "My husband had everything in our joint names with right of survivorship." Plaintiffs insist that Mr. Harlan had continued to treat the mineral leases and rights as his own as evidenced by the September 21, 1981 instrument which gives defendant the right "to sell the mineral interests I hold...." They argue that if, in fact, Mr. Harlan had intended to create a joint ownership in the mineral leases and rights with the defendant, it could reasonably be assumed that he or the defendant would have notified the oil companies of the change in ownership. They also argue that the only evidence in

the record that the "Mineral Deed" was delivered to the defendant was the testimony of the defendant herself.

In this case Mr. Harlan continued to treat the property as his own because it remained his property. The "Mineral Deed" simply created joint ownership between Mr. Harlan and defendant. If Mr. Harlan had transferred the entire title to defendant and continued to treat the property as his own, then the situation might have been different. However, this is not the case here.

Here, the Chancellor found that there had been a valid delivery. The record supports that finding: (1) Defendant had the "Mineral Deed" in her possession; (2) She testified that Mr. Harlan delivered the "Mineral Deed" to her. Standing alone, these facts would probably be insufficient to establish delivery. However, the record shows that (1) Mr. Harlan told Linda Cripps that he had given the mineral rights to defendant after the date of the execution, and (2) Mr. Harlan told Jimmy Hewlett, one of the witnesses to the execution of the "Mineral Deed," that he was "giving it to her [defendant]. And we signed it." He also testified that Mr. Harlan read the document and that it was explained to him.

These issues are without merit.

We discuss together plaintiffs' fifth and sixth issues by which they contend that the "transfer is presumed to be invalid because it was made by a subordinate member of a confidential or fiduciary relationship to a dominant member," and that the presumption of invalidity has not been overcome because there has been neither a showing that the donor, Mr. Harlan, received competent, independent counsel or advice, nor that the defendant was not guilty of overreaching or abuse of the confidential relationship.

Mr. Harlan executed a general power-of-attorney on December 4, 1979, in which he appointed defendant his attorney-in-fact. Plaintiffs, therefore, argue that the power-of-attorney creates a "confidential and fi-

duciary relationship" between Mr. Harlan and defendant. *Arnoult v. Griffin*, 490 S.W.2d 701 (Tenn.App.1972). They then argue that the confidential relationship, coupled with the fact that defendant was the dominant member and Mr. Harlan the subordinate member of the relationship, creates a presumption that the "gift" is presumed to be invalid, and that the burden is on defendant to rebut this presumption. *E.g., Roberts v. Chase*, 25 Tenn.App. 636, 166 S.W.2d 641 (1942).

While the evidence is that Mr. Harlan was in serious physical condition for the last one and a half years of his life, he remained his own man. He insisted in having his own way and everyone abided by his wishes. He was very independent. There is evidence that his mental faculties remained excellent. There is ample evidence that, as between defendant and Mr. Harlan, Mr. Harlan was the dominant member and defendant the subordinate member of the relationship.

Plaintiffs have failed to carry their appellate burden of showing that the Chancellor erred in finding that there was no "undue influence or duress or overreaching being practiced upon [Mr. Harlan] by the defendant." *Capital City Bank v. Baker*, 59 Tenn.App. 477, 442 S.W.2d 259 (1969). The preponderance of the evidence is that defendant is not guilty of undue influence or overreaching.

These issues are without merit.

■ Plaintiffs, by their seventh issue, say that Mr. Harlan by his gift impoverished himself and that "gifts of the whole of the donor estate which results in the impoverishment of the donor or his estate are presumed to be invalid."

There is no proof in this record that the gift of the mineral leases impoverished Mr. Harlan. The instrument created a joint tenancy between Mr. Harlan and defendant in the mineral leases in the states of Texas, Arkansas, Kansas, Kentucky, Louisiana and Oklahoma. He continued to own these mineral leases with the defendant. Mr. Harlan also owned United Royalty, and no present gift was attempted to be made of that property.

The record does not support the plaintiffs' assertion that the gift impoverished his estate.

■ By their eighth, and last, issue, plaintiffs assert that the "Court should reject the entire testimony of [defendant because she] has wilfully given false statements under oath as to a material point."

Defendant, after Mr. Harlan's death and after the commencement of the administration of his estate, executed affidavits to certain oil companies which were paying royalties on the mineral leases. In the affidavits she stated that Mr. Harlan had no children, that there was no administration of the estate, and that she was Mr. Harlan's sole heir, in order to induce the oil companies to make the royalty payments to her.

The Chancellor as the trier of fact was at liberty to disregard the entire testimony of defendant if it be shown that she "wilfully, falsely and corruptly [testified] in one material respect." *Railroad v. Morgan*, 132 Tenn. 1, 19, 175 S.W. 1148 (1914). However the Chancellor was not compelled to disregard her entire testimony. The credibility of the witnesses is for the Chancellor to determine and, in the absence of other real evidence, his determination of a witness' credibility will not be disturbed on appeal. *State ex rel. Balsinger v. Town of Madisonville*, 222 Tenn. 272, 282, 435 S.W.2d 803, 807 (1968).

Had one or more of the members of this Court been sitting as the Chancellor in this case, a different result might have been reached. However, we are not in the same posture as the Chancellor. We review the findings of the Chancellor in this case, as in other cases heard by the Chancellor without the intervention of a jury, *i.e.*, with a presumption of the correctness of the findings; and unless we find an error of law or unless the evidence preponderates against the findings of the Chancellor, we must affirm. Tenn.R.App.P. 13(d).

175

The findings and judgment of the Chancellor are supported by a preponderance of the evidence.

We, therefore, affirm the judgment of the Chancellor with costs assessed against the plaintiffs. The cause is remanded to the Chancery Court for the collection of costs and any further necessary proceedings.

TODD, P.J., and CANTRELL, J., concur.

ORDER ON PETITION TO REHEAR

Plaintiffs-appellants have filed their petition to rehear which re-argues matters which were fully argued and considered by the Court. "A rehearing will not be granted to permit re-argument of matters fully argued." Tenn.R.App.P. 39(a).

The petition to rehear is overruled at the cost of plaintiffs-appellants.