IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 18, 2025 Session

## BETTY JANE DAVIS v. LEESA RENNA DAVIS ET AL.

**Appeal from the Circuit Court for Henderson County**
**No. 23014-1  Joseph T. Howell, Judge**

———————————————————

### No. W2025-00326-COA-R3-CV

———————————————————

This case arises out of allegations that Appellees misappropriated Appellant's inheritance funds for their own use.  Appellant also alleges elder abuse based on the conversion as well as a physical altercation between Appellant and an Appellee.  Appellees allege that Appellant gifted them the inheritance funds.  In its findings of fact and conclusions of law, the trial court concluded that: (1) because Appellant engaged in bad faith, the doctrine of unclean hands applied and barred her full recovery; (2) Appellees converted and misappropriated a portion of Appellant's inheritance funds; (3) Appellees did not commit elder abuse; and (4) Appellant intended a partial gift of the inheritance funds to Appellees. Because the trial court erred when it *sua sponte* raised the affirmative defenses of bad faith and unclean hands, we reverse the trial court's application of these doctrines to reduce the judgment awarded to Appellant.  We also conclude that the trial court failed to consider the elements of elder abuse, the elements of a properly executed gift, and failed to make appropriate findings of fact and conclusions of law concerning the same.  As such, we vacate the trial court's order as to Appellant's elder abuse claim and Appellees' gift claim. Accordingly, we vacate the judgment awarded to Appellant.  The remainder of the trial court's order is affirmed.  The case is remanded to the trial court for further proceedings consistent with this Opinion.  Appellant's request for appellate attorney's fees is pretermitted.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed in Part; Vacated in Part; Affirmed in Part; and Remanded**

VALERIE L. SMITH, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Adam C. Crider, Craig P. Sanders, Morgan L. Weeks, Jackson, Tennessee, for the appellant, Betty Jane Davis.

Samuel W. Hinson, Lexington, Tennessee, for the appellees, Leesa Renna Davis, and Scott Creasy.

## OPINION

### I. Background

At the outset, we note the limited appellate record. Most of the record is comprised of Appellant's filings only, several of which concern discovery. As noted below, Appellees' Answer does not appear in the record. Most of the facts in the appellate briefs are taken from either the trial court's orders or Appellant's statement of the evidence, discussed further *infra*, which had several exhibits attached to it. It does not appear that Appellees disputed the statement of the evidence or filed their own version. With the foregoing in mind, we turn to the facts of the case.

On or about February 14, 2022, Appellant Betty Jane Davis ("Mother") inherited $57,855.72 at her mother's death. The inheritance was given to Mother via two checks from her mother's estate: one check for $9,291.06 ("Check 1") and one check for $48,564.66 ("Check 2") (together, the "Checks"). At the time, Mother was 81 years old, and her sole source of income was from Social Security payments. Mother has two children, Leesa Renna Davis ("Daughter") and Richard Davis ("Son"). Daughter's long-term boyfriend is Scott "Chip" Creasy (together with Daughter, "Appellees"). It is undisputed that, by February of 2022, Mother deposited both Checks into Appellees' joint bank account (the "Credit Union Account") at the Employee Resources Credit Union in Lexington, Tennessee (the "Credit Union"). It is also undisputed that, when Mother deposited Check 2, she withdrew $10,000.00 to give to Son as a gift.

Mother and Daughter dispute the reason Mother deposited the Checks into Appellees' joint account. Mother alleges that she resided in Mississippi when she received her inheritance, and she wanted to use the funds to purchase a new house in Henderson County, Tennessee, to be closer to Daughter, Son, and other family. Until that purchase, Mother wanted to deposit the funds into a bank local to Henderson County, but she did not have a bank account there. Mother further alleges that, although she had a good relationship with Daughter, she did not trust her with the money and would not have deposited the funds into an account where Daughter was also on the account. Likewise, although Mother had a relationship with Son, she asserts that they were not extremely close at the time such that she would be comfortable depositing the funds into his account. Mother contends that Daughter advised Mother that: (1) Mother could deposit the Checks into Mr. Creasy's account at the Credit Union; and (2) the account was solely in Mr. Creasy's name. Mother asserts that Daughter and Mr. Creasy had been in a long-term relationship, and that Mother trusted him.

To the contrary, Daughter alleges that Mother was always aware that Daughter was also on the Credit Union Account. Concerning why Mother deposited the funds into the Credit Union Account, Daughter contends that it was to prevent Medicaid from becoming aware of the inheritance assets and potentially losing government benefits because of the inheritance. Daughter alleges that she and Mother visited the Corinth, Mississippi Medicaid office where they were advised that any inheritance received would be calculable assets used to determine whether Mother qualified for Medicaid. Mother contends that she neither remembered what was discussed at this meeting nor that she was even present for it. Daughter also alleges that, in addition to Mother trying to avoid losing government benefits, Daughter believed that the deposits into the Credit Union Account were gifts from Mother to Daughter and part of Daughter's inheritance. Mother denies gifting the funds.

In the months that followed the deposits into the Credit Union Account, Mother, Daughter, and others readied Mother's Mississippi house for sale and searched for a new house in Henderson County, Tennessee for her. Daughter states that she used $4,500.00 from the Credit Union Account for repairs on Mother's Mississippi house. Mother claims that she does not remember authorizing or discussing those funds being used for repairs and that Daughter did not provide receipts for same.

Sometime later, Mother experienced some serious health issues, which resulted in her moving in with Daughter. Daughter alleges that Mother suffered from dementia and was often confused and agitated. Daughter also states that Mother previously suffered from a serious urinary tract infection ("UTI"), had high blood pressure, did not maintain a healthy diet, and had been on anti-depressant medication for several years. Mother alleges that, although she experienced forgetfulness that was typical of any 81-year-old, she had never been diagnosed with dementia. Rather, Mother states that she has high blood pressure and takes an anti-depressant on a regular basis.

On December 19, 2022, Mother and Daughter had an "altercation." The parties dispute the exact facts surrounding this altercation. Mother alleges that she argued with Daughter after Daughter took Mother's cell phone from her, and that, during the argument, Daughter's dog fled from the house. Mother contends that this made Daughter angry, so Daughter pushed Mother down, causing her to hit her head and cut her arm. Conversely, Daughter alleges that Mother was very agitated the day of the altercation. Daughter admits that she took Mother's cell phone because she was worried that Mother was trying to contact someone to take her away from Daughter's home. Daughter alleges that Mother had become prone to wandering away and getting lost. Daughter contends that, when she took Mother's cell phone, Mother became extremely angry and pushed Daughter. Thereafter, Daughter's dog fled from the house. Daughter alleges that she wanted to find the dog because it was aggressive, and she was worried that others in the neighborhood could be injured. Daughter states that Mother was blocking the doorway, and, as Daughter calmly went to retrieve the dog, Mother tripped, causing her to fall, hit her head, and cut her arm. Although Mother and Daughter dispute the facts surrounding the altercation, they

- 3 -

agree that Daughter called 911 after Mother fell. Thereafter, EMTs took Mother to the hospital. The next day, Daughter went to Mississippi to work on Mother's house. That day, Daughter also withdrew $15,000.00 from the Credit Union Account, but she cannot recall what she used the funds for and cannot verify that it was for Mother.

When Mother was discharged from the hospital, Son took her to the Credit Union to withdraw the funds she had deposited into the Credit Union Account. Mother alleges that the Credit Union staff informed her that she would need to contact Mr. Creasy to withdraw the funds, as he was the owner of the account. Mother states that she called Mr. Creasy, but he refused to discuss the issue or answer the phone. Mr. Creasy contends that he spoke with Mother on at least one occasion and informed her that he would need to speak with Daughter about the funds. Mr. Creasy admits that he did not answer most of Mother's phone calls or return her messages. On January 17, 2023, Mother sent a handwritten letter, via certified mail, to Mr. Creasy asking him to return the inheritance funds to her. Mr. Creasy admits that he did not respond to the letter. On March 3, 2023, Mother's attorney in Mississippi sent Mr. Creasy a letter asking him to release Mother's inheritance and threatening a lawsuit if he did not comply. Mr. Creasy admits that he did not respond to the letter. Mother alleges that sometime thereafter she learned that Daughter was also an owner of the Credit Union Account.

Daughter admits that essentially all of the money from the Checks has been spent. Although she used $6,500.00 of the funds to retain her attorney in this lawsuit, Daughter cannot recall for what else she used the funds.

On May 9, 2023, Mother filed a complaint against Appellees in the Circuit Court for Henderson County, Tennessee ("trial court"), alleging conversion of personal property, intentional misrepresentation/fraud, elder abuse, and constructive trust. Appellees' Answer does not appear in the appellate record.

On November 8, 2024, the trial court conducted the final trial. The following witnesses testified: (1) Mother; (2) Son; (3) Daughter; (4) Mr. Creasy; (5) Bethany Roach, Mother's granddaughter; and (6) Jerry Henry, a family friend. The trial court also considered the deposition of Rebecca A. Nass, M.D., Mother's treating physician. It is unclear from the record how many exhibits were entered into evidence.

On November 14, 2024, the trial court entered its findings of facts and conclusions of law. We discuss the trial court's specific findings of fact further *infra*. The trial court made the following conclusions of law: (1) Mother conspired with Daughter to deposit the inheritance funds in the Credit Union Account "with the intent to defraud Medicaid" so that Mother would not risk losing her benefits; (2) Mother did not intend to make a complete gift of the funds to Appellees; (3) beginning December 20, 2022 and thereafter, Daughter misappropriated and converted the remaining funds in the Credit Union Account, and Mr. Creasy received the benefit of the misappropriated and converted funds; (4) the

December 19, 2022 altercation between Mother and Daughter and the subsequent conversion/misappropriation of the remaining funds in the Credit Union Account did not rise to the level of elder abuse; (5) because Mother deposited the Checks in bad faith and with the intent to defraud, she was barred from full recovery based on the doctrine of unclean hands. Accordingly, the trial court entered a judgment in Mother's favor for $16,750.00.

On December 3, 2024, Mother filed a motion to reconsider, asking the trial court to find Appellees committed elder abuse and to modify the judgment to include the entire amount of misappropriated and converted funds and for attorney's fees.

On February 10, 2025, the trial court entered an order modifying the judgment and denying the motion to reconsider. The trial court increased the judgment entered against Appellees to $26,041.06. This increase was based on the trial court's previous miscalculation of Mother's inheritance as the trial court inadvertently omitted Check 1, *i.e,* $9,291.06, from its calculations. As to Mother's request that the trial court find elder abuse and permit her full recovery, the trial court denied it. We note that in footnote 1 of this order, the trial court stated that Appellees' counsel admitted at the hearing that Appellees did not raise unclean hands or bad faith as affirmative defenses in their Answer and/or at trial.

On March 6, 2025, Mother filed a notice of appeal.

On April 8, 2025, Mother filed a statement of the evidence. As noted above, it does not appear that Appellees disputed the statement or filed a competing one. Attached as exhibits to the statement of the evidence were: (1) Dr. Nass's deposition transcript; (2) copies of the Checks; (3) Daughter's texts to family members concerning Mother's state of mind; (4) teller receipts from the Credit Union Account; (5) Mother's handwritten letter to Mr. Creasy; (6) the letter from Mother's Mississippi attorney to Mr. Creasy; and (7) Daughter's responses to Mother's first set of interrogatories and requests for production.

By order of June 24, 2025, this Court remanded the case to the trial court to enter an order that indicated it had been served on counsel for Appellees in compliance with Rule 58 of the Tennessee Rules of Civil Procedure. On July 2, 2025, the trial court entered a revised order complying with the Rule. On July 10, 2025, Mother filed a revised notice of appeal.

## II. Issues

Mother raises two issues for our review, as stated in her brief:

1. Whether the Trial Court erred by *sua sponte* raising the affirmative defenses of bad faith and unclean hands[] and relying on such defenses in reducing the amount of

damages awarded to Plaintiff, when Defendants waived the defenses by failing to raise them in their Answer or at trial.

2. Whether the Trial Court erred by finding that the elements of elder abuse, as outlined in the Tennessee Adult Protection Act, were not met even though the Trial Court specifically found that Defendants misappropriated and converted a large sum of money from Plaintiff, who is elderly and has serious health problems.

Appellees raise as an additional issue whether the trial court erred when it found that Mother made only a partial gift to Appellees.

## III. Standard of Review

We review a non-jury case "*de novo* upon the record with a presumption of correctness as to the findings of fact, unless the preponderance of the evidence is otherwise." *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citing Tenn. R. App. P. 13(d)). The trial court's conclusions of law are reviewed *de novo* and "are accorded no presumption of correctness." *Brunswick Acceptance Co., LLC v. MEJ, LLC*, 292 S.W.3d 638, 642 (Tenn. 2008).

## IV. Analysis

### A. Bad Faith and Unclean Hands

We first address whether the trial court erred when it *sua sponte* raised the affirmative defenses of bad faith and unclean hands. The Tennessee Supreme Court has explained that

> "[a]n affirmative defense is one that wholly or partly avoids the cause of action asserted by the preceding pleading by new allegations that admit part or all of the cause of action, but avoids liability because of a legally sufficient excuse, justification, or other matter negating the alleged breach or wrong." *Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin*, 765 S.W.2d 743, 744 (Tenn. Ct. App. 1987) (quoting Lawrence A. Pivnick, Tennessee Circuit Court Practice § 12: 4 (2nd Ed. 1986)); *see also* Tenn. R. Civ. P. 8.03. An affirmative defense generally is deemed waived unless timely raised in an answer or responsive pleading. *See* Tenn. R. Civ. P. 12.08; *Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 735 (Tenn. 2013) (discussing affirmative defenses).

*Church of God in Christ, Inc. v. L. M. Haley Ministries, Inc.*, 531 S.W.3d 146, 157 (Tenn. 2017); *see also Tennessee State Bank v. Mashek*, 616 S.W.3d 777, 813 (Tenn. Ct. App. 2020) (stating that "the doctrine of unclean hands is an affirmative defense that must be

proven by the defendant"); *Old Republic Sur. Co. v. Eshaghpour*, No. M1999-01918-COA-R3-CV, 2001 WL 1523364, at *3 (Tenn. Ct. App. Nov. 30, 2001) (acknowledging bad faith as an affirmative defense).

It is undisputed that Appellees did not raise bad faith or unclean hands as affirmative defenses in their Answer to Mother's Complaint. As discussed above, failure to do so generally results in waiver of the defenses. Waiver aside, the more precise issue here is whether a trial court may *sua sponte* raise these defenses. This Court has explained that the rationale for the affirmative defense pleading requirement is to "'prevent a party from raising a defense at the last possible moment and thereby prejudicing the opposing party's opportunity to rebut the defense.'" *Fryer v. Conservatorship of Fryer*, No. E2009-01009-COA-R3-CV, 2010 WL 3893765, at *6 (Tenn. Ct. App. Oct. 5, 2010) (citing *Sands v. State*, 903 S.W.2d 297, 299 (Tenn. 1995)); *George v. Alexander Auto., LLC*, No. M2006-02655-COA-R3-CV, 2007 WL 2726373, at *1 (Tenn. Ct. App. Sept. 19, 2007). Aside from the fact that Appellees did not plead bad faith or unclean hands in their Answer, there is no indication in the statement of the evidence that these defenses were even raised *by the trial court during trial*. Rather, the first mention of these defenses appears in the trial court's findings of fact and conclusions of law. Accordingly, Mother was never provided notice that the affirmative defenses would be considered, she was not afforded the opportunity to rebut them, and she was not made aware that they were at issue until *after* the trial in the trial court's ruling. Indeed, the statement of the evidence provides that Mother "gave no testimony as to trying to avoid potential loss of Medicaid or governmental benefits." Given that the trial court relied on these doctrines to reduce Mother's recovery, she was clearly prejudiced by its *sua sponte* application of these defenses. For the foregoing reasons, we conclude that the trial court erred in *sua sponte* applying the affirmative defenses of bad faith and unclean hands to reduce the judgment awarded to Mother. *See Fryer*, 2010 WL 3893765, at *6 (concluding that the trial court erred in raising *sua sponte* a statute of limitations defense to reduce the amount of spousal support owed to husband).[1]

## B. Elder Abuse

Mother's second issue concerns whether the trial court erred when it found that Appellees did not commit elder abuse against her. The Tennessee Adult Protection Act (the "Act") provides, in relevant part:

> (b) In addition to other remedies provided by law, *an elderly person* or disabled adult in that person's own right, or by conservator or next friend, *has a right of recovery in a civil action for compensatory damages for abuse*

---

[1] For completeness, we note that, at oral argument before this Court, Appellees' attorney conceded that the doctrines of bad faith and unclean hands were affirmative defenses and that the trial court erred in raising such defenses *sua sponte*.

- 7 -

*or neglect*; sexual abuse or exploitation, as defined in this part; *theft of such person's or adult's money or property whether by fraud, deceit, coercion, or otherwise*; *or abuse* or neglect, sexual abuse, or financial exploitation, as those terms are defined in § 31-4-106, *by a caretaker*.

Tenn. Code Ann. § 71-6-120(b) (emphases added).

An "elderly person" is defined in the statute as "a person who is sixty (60) years of age or older who has some mental or physical dysfunctioning, including any resulting from age." Tenn. Code Ann. § 71-6-120(a)(3). Mother argues that she meets the definition of an "elderly person" because she is over 60 years of age and suffers from some mental or physical dysfunctioning. Specifically, Mother cites Daughter's testimony that Mother had a history of dementia and was often confused and agitated. She also cites Daughter's testimony that Mother suffered from a serious UTI, had high blood pressure, and had been on depression medication. Although Mother relies on Daughter's testimony on appeal, we note that Mother testified "that she was forgetful as any 81-year-old would be, but that she just had high blood pressure and depression medication that she took on a regular basis." While Mother's testimony confirmed that she had had a UTI, she denied that she had been diagnosed with dementia. We also note that Mother's treating physician, Dr. Nass, testified that Mother's test results revealed that Mother had either mild cognitive impairment or depression. Dr. Nass further testified that she did not believe Mother required a memory aid medication and that Mother's cognitive symptoms improved after Mother was placed back on her depression medication.

Mother also alleges that Appellees "perpetrated a theft of Mother's inheritance through fraudulent and deceitful means." Mother argues that the trial court acknowledged this theft when it concluded that Appellees misappropriated and converted some of the inheritance funds. Conversion and misappropriation are intentional torts sounding in fraud. *See PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 547 (Tenn. Ct. App. 2012). "Conversion" is defined as "the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights." *Id.* at 553 (citing *Barger v. Webb*, 391 S.W.2d 664, 665 (Tenn. 1965); *Lance Prods., Inc. v. Commerce Union Bank*, 764 S.W.2d 207, 211 (Tenn. Ct. App. 1988)). Similarly, "misappropriation" is defined as "[t]he application of another's property or money dishonestly to one's own use." MISAPPROPRIATION, Black's Law Dictionary (12th ed. 2024).

Additionally, Mother alleges that she suffered physical abuse from Daughter during the December 19, 2022 altercation. Concerning abuse, the Act defines it, in pertinent part, as "[a] situation in which a caretaker . . . [i]nflicts physical pain, injury, or mental anguish" on the elderly person. Tenn. Code Ann. § 71-6-102(A)(i); *see also* Tenn. Code Ann. § 31-4-106(a)(1)(A). A "caretaker" includes an adult child who:

(i) Resides with or in the same building with or regularly visits the adult;

(ii) Knows or reasonably should know of the adult's mental or physical dysfunction or advanced age; and

(iii) Knows or reasonably should know that the adult is unable to adequately provide for the adult's own care;

Tenn. Code Ann. § 71-6-102(5)(B).

Unfortunately, our review of this issue is precluded by the trial court's sparse findings of fact and conclusions of law. Tennessee Rule of Civil Procedure 52.01 provides that, "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." Tenn. R. Civ. P. 52.01. Findings of fact and conclusions of law serve three purposes: (1) facilitation of appellate review by affording this Court a clear understanding of the basis of a trial court's decision; (2) precisely defining what is being decided in the case in order to apply the doctrines of estoppel and res judicata in future cases and to promote confidence in the trial court's decision-making; and (3) eliciting care on the part of the trial court in ascertaining and applying the facts. *Lovlace v. Copley*, 418 S.W.3d 1, 34-35 (Tenn. 2013) (internal citations omitted).

As an initial matter, the trial court made no findings of fact or conclusions of law concerning whether Mother met the definition of an "elderly person," despite proof of Mother's age and various physical and mental ailments. Regarding Mother's allegations of theft and physical abuse, it appears the trial court made the following findings:

4. On February 25, 2022, [Mother] deposited the funds into [the Credit Union Account] belonging to [Appellees].

\*\*\*

6. [Mother] testified she was not threatened, forced or coerced to make the deposit into [Appellees'] [C]redit [U]nion [A]ccount.

7. There was no formal agreement that the funds would be returned to [Mother].

8. According to [Mother], it was more convenient for her to deposit the funds into the credit union in Tennessee because she intended to purchase a house in Tennessee.

\*\*\*

- 9 -

10. On October 28, 2022, [Mother] signed [a] power of attorney designating [Daughter] as her agent.

\*\*\*

12. On December 19, 2022, [Mother and Daughter] argued, which resulted in injury to [Mother] and in her being taken by ambulance to the emergency room in Lexington, Tennessee.

\*\*\*

15. On December 20, 2022, the day after the domestic altercation, interaction with first responders and law enforcement officers and two (2) hospital trips, [Daughter] withdrew $15,000.00 from the [C]redit [U]nion [A]ccount, but was unable to recall what the funds were used for, nor was she able to produce any receipts or other documentation.

16. On December 20, 2022, [Mother] was taken by [Son] to an attorney's office, where she revoked the October 28, 2022 power of attorney designating [Daughter] as her agent.

17. On January 17, 2023, [Mother] mailed a letter to [Mr.] Creasy requesting the funds be returned to her.

18. On March 3, 2023, [Mother] mailed [Mr.] Creasy another letter requesting the return of the funds.

The trial court also made the following conclusions of law:

3. The [c]ourt finds [that Daughter] committed misappropriation and conversion of the remaining funds in the [C]redit [U]nion [A]ccount beginning on December 20, 2022 and thereafter, that [Mr. Creasy] received the benefit of the misappropriation and conversion of the funds.

4. The [c]ourt finds that the December 19, 2022 domestic incident and the subsequent misappropriation of the remaining funds in the [C]redit [U]nion [A]ccount does not rise to the level of elder abuse.

As shown above, despite the trial court's conclusion that Appellees misappropriated and converted a portion of Mother's inheritance funds, *i.e.,* engaged in theft of Mother's money via fraud, it nevertheless concluded that such misappropriation and conversion "does not rise to the level of elder abuse." While there is no further explanation for these

contradictory conclusions, we deduce that the trial court rested its latter conclusion on its finding that Mother "was not threatened, forced[,] or coerced to make the deposit[.]" Although the Act provides that theft by coercion may provide a basis for a claim under same, it is not the sole basis for a claim under the Act. As discussed above, the Act also provides that theft by *fraud, deceit, or otherwise* may provide such basis. Tenn. Code Ann. § 71-6-120(b). Concerning Mother's physical abuse claim, the trial court failed to make any relevant findings of fact to support its conclusion that the December 19, 2022 domestic incident did not rise to the level of elder abuse. For example, the trial court made no finding concerning whether Daughter met the definition of "caretaker," despite evidence that Mother lived with Daughter when the altercation took place. *See* Tenn. Code Ann. § 71-6-102(5)(B). Furthermore, the trial court failed to make a finding concerning whether Daughter was responsible for inflicting physical pain or injury on Mother. Tenn. Code Ann. § 71-6-102(A)(i). Given that the trial court failed to apply the elements of the Act to Mother's claims for elder abuse, that it failed to make the relevant findings of fact to support its conclusions, and that its conclusions are contradictory, we vacate the trial court's order on Mother's elder abuse claims.

On appeal, Mother requests that this Court award her trial and appellate attorney's fees under the Act. *See* Tenn. Code Ann. § 71-6-120(d). Because we vacate, rather than reverse, the trial court's conclusion that Appellees did not commit elder abuse, we make no decision concerning whether elder abuse occurred. Accordingly, we cannot award attorney's fees under the Act. As such, the issue of attorney's fees is pretermitted.

### C. Gift

Lastly, Appellees raise the issue of whether the trial court erred when it concluded that Mother did not intend to make a *complete* gift of her inheritance funds to Appellees. "The party asserting that they acquired the property by gift has the burden of proving the essential elements of a gift by clear and convincing evidence[.]" *Trezevant v. Trezevant*, 568 S.W.3d 595, 615 (Tenn. Ct. App. 2018). This Court has explained:

> Two elements must be present in order to find a properly executed gift inter vivos. *Arnoult v. Griffin*, 490 S.W.2d 701, 710 (Tenn. Ct. App. 1972) (citing *Dodson v. Matthews*, [] 117 S.W.2d 969 (Tenn. 1938)). First, the donor must have the present intent to make a gift to the donee. *Id.* Intent is determined from the totality of the circumstances. *Id.* Second, the donor must deliver the gift to the donee. *Id.* For delivery to occur, the donor must "surrender complete dominion and control of the gift" to the donee. *Pamplin v. Satterfield*, [] 265 S.W.2d 886, 888 (Tenn. 1954). To prove delivery, the donee must show "evidence free from personal interest and not equivocal in character that the property claimed was delivered to donee during the donor's life . . . ." *Atchley v. Rimmer*, [] 255 S.W. 366, 369 (Tenn. 1923). "The testimony of the beneficiary of an inter vivos gift is not sufficient to establish

the gift." [*Union Planters Bank, N.A. v. Shepard*, No. W2002-01188-COA-R3-CV, 2003 WL 21729443, at \*4 (Tenn. Ct. App. July 14, 2003)] (citing *Atchley*, 255 S.W. at 369). Mere possession of the property at issue is not enough. *Id.* The donee must prove both intent and delivery by clear and convincing evidence. *Parsley v. Harlan*, 702 S.W.2d 166, 173 (Tenn. Ct. App. 1985) (citing *Ingram v. Phillips*, 684 S.W.2d 954 (Tenn. Ct. App. 1984)).

*In re Est. of Greene*, No. W2004-02910-COA-R3-CV, 2005 WL 2978991, at \*3 (Tenn. Ct. App. Nov. 7, 2005); *see also Harris v. Taylor*, No. W2004-02855-COA-R3-CV, 2006 WL 772007, at \*5 (Tenn. Ct. App. Mar. 28, 2006). Furthermore, any "[d]oubts must be resolved against the gift." *Pamplin*, 265 S.W.2d at 888.

In their appellate brief, Appellees argue that Mother intended to make a complete gift based on Daughter's testimony at trial and her "discovery responses that at the time [Mother] deposited the money into the [C]redit [U]nion [A]ccount it was intended to be a gift and part of [Daughter's] inheritance." As discussed above, the testimony of the beneficiary of a gift, *i.e.,* Daughter, is insufficient to establish a gift. "This long-standing rule seeks to prevent the sort of fraud which easily could be perpetuated when the testimony of an interested beneficiary is offered as the only proof of gift after the death of the donor." *Union Planters Bank, N.A.*, 2003 WL 21729443, at \*4. Aside from the foregoing, Appellees argue that the following circumstantial evidence demonstrates Mother's intent to gift the money to Daughter: (1) Mother's testimony that she was not forced, threatened, or coerced to deposit the money in Appellees' account; (2) the trial court's finding that there was no agreement to return the money to Mother and that Mother did not request a return of the money until a year after it was deposited; and (3) when the money was deposited, $10,000.00 was withdrawn and given to Son as a gift. Appellees also argue that the "gift was completed upon delivery of the money into [Appellees'] bank account." However, as discussed above, "[m]ere possession of the property at issue is not enough." *In re Est. of Greene*, 2005 WL 2978991, at \*3 (citing *Union Planters Bank, N.A.*, 2003 WL 21729443, at \*4).

Our review of this issue is again hampered by the trial court's lack of findings of fact and conclusions of law. *See* Tenn. R. Civ. P. 52.01. The trial court's order neither discussed the elements required to make a gift, nor did it make any findings of fact concerning such elements. Rather, the trial court merely concluded that Mother "did not intend to make a complete gift to [Appellees]." In this conclusion, the trial court failed to state the monetary amount that it concluded Mother gifted to Appellees, and/or that Appellees proved that Mother gifted them this amount by clear and convincing evidence. Although Appellees ask this Court to find that Mother intended to gift all of the funds in the Credit Union Account to them, because the trial court failed to consider the elements of an inter vivos gift and failed to make relevant findings of fact and conclusions of law

concerning same, we vacate the trial court's conclusion that Mother intended to make even a partial gift to Appellees.

## V. Conclusion

For the many reasons discussed above, we vacate the $26,041.06 judgment awarded to Mother. We reverse the trial court's conclusion that Mother engaged in bad faith, and we reverse its application of the doctrine of unclean hands to limit Mother's recovery. We vacate the portions of the trial court's order concerning Mother's elder abuse claim and Appellees' gift claim. The case is remanded to the trial court in order to: (1) reconsider the amount awarded to Mother without relying on the doctrines of bad faith and unclean hands; (2) consider the elements of elder abuse; (3) consider the elements of a properly executed gift; and (4) make the relevant findings of facts and conclusions of law concerning Mother's elder abuse claim and Appellees' gift claim. The trial court's order is otherwise affirmed. Mother's request for appellate attorney's fees is pretermitted. The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed one-half to the Appellant, Betty Jane Davis, and one-half to the Appellees, Leesa Renna Davis and Scott Creasy. Execution for costs may issue if necessary.

s/ Valerie L. Smith
VALERIE L. SMITH, JUDGE